STATE OF NORTH CAROLINA v. LARRY NOBLE DANIEL

No. 136A92

(Filed 4 June 1993)

1. **Evidence and Witnesses § 2302 (NCI4th)— murder and assault—expert testimony—alcoholism—ability to plan—admissible**

There was prejudicial error in a prosecution for murder and assault with a deadly weapon with intent to kill inflicting serious injury in the exclusion of testimony from defendant's expert in psychiatry and addiction that defendant suffered from both chronic and acute alcohol dependence; that defendant suffered from severe nervous system impairment, including significant brain atrophy; that defendant's ability to plan, think, or reflect was impaired; and that he was unable to form the specific intent to kill at the time of the shootings. Such testimony was relevant to whether defendant had premeditated and deliberated and to whether he intended to kill when he shot and wounded the assault victim and is not rendered inadmissible on the basis that it embraces ultimate issues to be decided by the jury. The term "specific intent to kill" is not a precise legal term with a definition which is not readily apparent and it has been held that a medical expert may properly be allowed to testify to his or her opinion that a defendant could not form the specific intent to kill. Finally, the exclusion of this evidence was prejudicial because the issue of defendant's state of mind constituted his only defense and the exclusion substantially reduced his ability to defend himself against the charges.

**Am Jur 2d, Expert and Opinion Evidence §§ 193, 194, 362, 363.**

**Admissibility of expert testimony as to whether accused had specific intent necessary for conviction. 16 ALR4th 666.**

2. **Evidence and Witnesses § 90 (NCI4th) — murder and assault — recorded telephone conversation with sheriff — probative value outweighs prejudice**

The trial court did not err in a prosecution for murder and assault with a deadly weapon with intent to kill inflicting serious injury by permitting the jury to listen to an audio tape recording of defendant's telephone conversation with the sheriff and to read transcripts of that recorded conversation. Although defendant contended that playing the tape created the danger of unfair prejudice, potential confusion of issues, and needless presentation of cumulative evidence, the recording was extremely probative in that defendant discussed problems he had had with his stepson, one of the victims, admitted shooting his stepson and "the other fellow," stated that he told the other victim that he would shoot him if officers came and did in fact shoot that victim because officers had been called, and stated that he should have "gotten" his stepson and that he hoped his stepson would die. This evidence was probative of defendant's mental state at the time of the shootings and, although it prejudiced defendant, it was not unfairly prejudicial. Evidence is unfairly prejudicial only if it unduly tends to suggest a decision on an improper basis.

**Am Jur 2d, Evidence § 260.**

Appeal of right by the defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Stephens, J., at the 7 October 1991 Criminal Session of Superior Court, Orange County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court on 15 February 1993.

*Michael F. Easley, Attorney General, by Clarence J. DelForge, Assistant Attorney General, for the State.*

*James E. Williams, Jr., Public Defender, by M. Patricia DeVine, Assistant Public Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant, Larry Noble Daniel, was indicted on 10 September 1990 on charges of murder and assault with a deadly

weapon with intent to kill inflicting serious injury. He was tried capitally at the 7 October 1991 Criminal Session of Superior Court, Orange County. The jury returned verdicts of guilty of first-degree murder and of assault with a deadly weapon with intent to kill. During a capital sentencing proceeding, the jury was unable to unanimously agree as to its sentence recommendation for the murder conviction. The trial court imposed a sentence of life imprisonment for the murder conviction and a consecutive ten-year sentence for the assault with a deadly weapon with intent to kill conviction.

The defendant appealed the first-degree murder conviction and resulting life sentence to this Court as a matter of right. On 17 June 1992, this Court allowed the defendant's motion to bypass the Court of Appeals on his appeal from the judgment imposing a sentence of ten years' imprisonment for assault with a deadly weapon with intent to kill.

The State presented evidence at the defendant's trial which tended to show the following. Stanley Horner is the defendant's thirty-six-year-old stepson. On 30 July 1990, Horner was living in the Orange County home of Tillie Daniel, Horner's mother and the defendant's estranged wife.

Horner testified that, on the morning of 30 July 1990, he took his mother to work. He then drove with Alton Florence to look at two house siding jobs that they were working on together. After taking measurements at the job sites, the two men went to Tillie Daniel's house at about 11:00 a.m. to plan the jobs. They were standing on the back porch when Horner heard the sound of a shell being chambered in a pump-action shotgun. He turned to look and saw the defendant standing between twelve and sixteen feet away, pointing a shotgun at him. Horner said to Florence, "Run like hell, we're going to get shot." As soon as he had spoken the words, Horner was shot in the back and was propelled by the shot into the house. He ran through the house, out the front door, and across the front yard. When he reached the dirt road in front of the house, he was shot again, and he fell. When he got back up and continued to run, he was shot a third time. Horner then saw the defendant go back toward the house. Horner was able to drag himself to the nearby home of the Wilsons, his aunt and uncle, where he telephoned 911 for help. He told the dispatcher that Larry Daniel had shot him. While he was talking to the 911 dispatcher, Horner heard four more gunshots.

Deputy Sheriff Joe Griffin of the Orange County Sheriff's Department testified that he responded to the call from the 911 dispatcher at 12:20 p.m. and arrived at the scene in about six minutes. When he pulled up in the driveway of the Wilsons' house, he saw two white males standing in the driveway across the road. Griffin went into the house and found Horner sitting on the floor and talking to the 911 dispatcher on the telephone. As Horner identified himself and stated that the defendant had shot him, Griffin heard what sounded like a shotgun blast outside. He called for assistance and then positioned himself outside. He saw no one else for approximately ten minutes while he waited for additional officers to arrive; the two men he had seen standing in the driveway earlier had disappeared.

When more officers arrived, the defendant's name was called over a loudspeaker, but he did not appear. As deputies began to approach the Daniel residence, Investigator Alexander "Skip" Wade of the Orange County Sheriff's Department discovered the body of Alton Florence lying face down to the left of the driveway, near the location where Griffin earlier had seen the two men standing. A pathologist later determined that Florence was killed by a shotgun blast to the chest.

Joretta Hayes testified that she received a telephone call from the defendant on 31 July 1990. The defendant asked to speak to Jim Mask. When Hayes told the defendant that Mask was not in, the defendant told her to tell Mask that he could not come in because the Sheriff's Department was looking for him. He told Hayes that he "blew somebody's ass off yesterday" and that his "stepkid" had caused it all. The defendant said that he could not come in because officers would shoot him on sight, and he did not want to go back to jail because he would "get the chair." He then told Hayes that he was going to the "lower part of Georgia."

Orange County Sheriff Lindy Pendergrass testified that the defendant called him on 31 July 1990 at around 3:00 p.m. Their telephone conversation was taped and later was transcribed. The jury was allowed to listen to the tape and to follow along with individual copies of the five-page transcript. During the conversation, the defendant admitted shooting the victims and stated that he hoped Horner would die.

Law enforcement officers located the defendant at a residence in Graham on 31 July 1990. On the way back to Hillsborough,

the defendant talked to Investigator Don Tripp and Investigator Jimmy Earp of the Orange County Sheriff's Department about what had happened. Neither officer questioned the defendant. The defendant told the officers that a man named Alvin had taken him to the Daniel house and had let him out. The defendant was behind the barn when Horner and Florence drove up. He stepped out from behind the barn and told them that he "had something for them." He then shot Alton Florence. Horner began to run toward the road, and he shot Horner. The defendant stated that he shot Florence again and killed him because Horner called the police. Before he killed Florence, he told Florence that "if the law came, he was going to blow his ass away." The defendant told the officers that when he saw the patrol car pull up, he shot Florence. The defendant stated that he was tired of what had been going on for the last few years and that he had been ordered off his property. The defendant smelled of alcohol when he made these statements to the officers, but he did not appear to be intoxicated.

The only witness called by the defendant was Thomas Brown, M.D., whom the defendant called as an expert in the areas of psychiatry and addiction medicine. Dr. Brown was found qualified by the trial court as an expert in these areas. Dr. Brown testified that he first examined the defendant in October of 1990. He also reviewed the defendant's medical records, which contained information extending as far back as 1978. Seven to nine of the sets of medical records dealt with diagnoses of the defendant's alcoholism, his need for detoxification, and attempts to treat him for alcoholism. Following the prosecutor's objection to testimony by Dr. Brown regarding the defendant's mental condition, the trial court conducted a *voir dire* hearing, after which the court sustained the prosecutor's objection.

[1] The defendant contends by his first assignment of error that the trial court erred in sustaining the State's objection to the expert testimony proffered by the defendant concerning the defendant's mental condition at the time of the shootings in question here. We agree.

During the direct examination of Dr. Brown, the defendant's counsel asked, "Based upon your examination of Mr. Daniels and your review of his medical record, do you have an opinion as to his mental condition on July 30, 1990?" The trial court sustained

the prosecutor's objection to this question. Defendant's counsel next asked, "Did you reach an opinion as to Mr. Daniel's mental condition based on your review of the records, your examination of Mr. Daniels?" Upon the prosecutor's objection to this question, the trial court ordered the jury to leave the courtroom and held a *voir dire* hearing outside the presence of the jury. During *voir dire*, Dr. Brown testified that, in his opinion, the defendant suffered from "both chronic and acute alcohol dependence." Dr. Brown testified that alcoholism is a disease recognized by the medical profession and that the disease of alcoholism is accompanied by a loss of nerve tissue and impaired functioning of nerve tissue, the effects of which are exacerbated by acute ingestion of alcohol.

Dr. Brown testified that his diagnosis of the defendant as suffering from chronic and acute alcohol dependence was based in part on his examination of the defendant's medical records, which showed a consumption of alcohol ranging from a fifth to a half-gallon of spirits per day since 1978. Dr. Brown testified that his diagnosis was further supported by the defendant's own description of his drinking pattern and by Brown's examination of the defendant in October 1990, at which time the defendant had been sober for nearly three months, yet still exhibited "severe abnormalities . . . consistent with an organic—meaning chemical or physical— impairment of brain functioning." Dr. Brown testified that the defendant suffered from nervous system impairment so severe that he was hospitalized after he was taken into custody. During the hospitalization, a CAT scan was performed which showed "significant brain atrophy, atrophy being the wasting away of the actual brain substance itself."

Dr. Brown further testified that he had interviewed the defendant regarding the events of 30 July 1990 and had concluded that the defendant's mental functioning on that date was typical of someone with a long-term and acute history of alcohol use. When asked how the defendant's illness affected his ability to make and carry out plans, Dr. Brown responded that

[t]he ability to plan is in the area of higher mental function that I mentioned to you before, the higher ones being most severely impaired by chronic and acute alcohol ingestion. Planning involves the ability to picture oneself in the future, the ability to envision consequences of one's actions and envision all of those consequences in their complexity. The ability to

> think about moral values. . . . So my sense of his ability to
> plan is that it would be very severely impaired, the way we
> use the term, the way we talk about it, meaning something
> with some complexity and some thought to it.

In Dr. Brown's opinion, "Mr. Daniel was a fellow at the time that
this shooting occurred where there was really substantial impair-
ment of capacity to plan, to think or reflect." Dr. Brown also stated
that, in his opinion, the defendant was unable to form the specific
intent to kill at the time of the shootings.

The trial court sustained the State's objection to Dr. Brown's
testimony, stating that "I am satisfied at this juncture of the pro-
ceeding, based upon the evidence that is before me, to allow this
testimony as I have just heard it to be an extension of existing
law. And the evidence would not be admissible under present law."
We disagree with the trial court's conclusion.

Pursuant to Rule 402 of the North Carolina Rules of Evidence,
"[a]ll relevant evidence is admissible, except as otherwise provided
by the Constitution of the United States, by the Constitution of
North Carolina, by Act of Congress, by Act of the General Assembly
or by these rules." Relevant evidence is "evidence having any tenden-
cy to make the existence of any fact that is of consequence to
the determination of the action more probable or less probable
than it would be without the evidence." N.C.G.S. § 8C-1, Rule
401 (1992). To convict this defendant of first-degree murder, the
State was required to prove beyond a reasonable doubt that the
defendant killed the victim after premeditation and deliberation.
*State v. Keel*, 333 N.C. 52, 58, 423 S.E.2d 458, 462 (1992); N.C.G.S.
§ 14-17 (Supp. 1992). Deliberation requires " 'an intent to kill, car-
ried out in a cool state of blood, in furtherance of a fixed design
for revenge or to accomplish an unlawful purpose and not under
the influence of a violent passion, suddenly aroused by lawful or
just cause or legal provocation.' " *Keel*, 333 N.C. at 58, 423 S.E.2d
at 462 (quoting *State v. Jackson*, 317 N.C. 1, 23, 343 S.E.2d 814,
827 (1986), *cert. granted and judgment vacated on other grounds*,
479 U.S. 1077, 94 L. Ed. 2d 133 (1987) ). Testimony of Dr. Brown,
a psychiatric expert, that in his opinion the defendant was suffering
from organic brain impairment, that the defendant's capacity to
plan, think or reflect was impaired at the time of the shootings,
and that the defendant was incapable of forming the specific intent
to kill at the time of the shootings was evidence tending to show

that the defendant acted without premeditation or deliberation when he killed Florence and that he was incapable of forming the specific intent to kill when he shot Horner. *See State v. Shank*, 322 N.C. 243, 248, 367 S.E.2d 639, 643 (1988). Therefore, such testimony was relevant in the defendant's trial for first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury.

Rule 702 of the North Carolina Rules of Evidence provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C.G.S. § 8C-1, Rule 702 (1992). Expert testimony that, as a result of his chronic alcohol abuse, the defendant suffered from organic impairment of brain functioning and from a loss of brain tissue which impaired his ability to think, plan, or reflect could assist the jury in determining a fact at issue—whether the defendant had premeditated and deliberated. *See Shank*, 322 N.C. at 248, 367 S.E.2d at 643. Dr. Brown's testimony that, in his expert opinion, the defendant lacked the capacity to form the specific intent to kill at the time of the shooting also could help the jury determine whether the defendant had premeditated and deliberated before killing Florence. *See State v. Rose*, 323 N.C. 455, 458, 373 S.E.2d 426, 428 (1988). Likewise, the tendered testimony of Dr. Brown that the defendant was unable to form a specific intent to kill at the time of the shootings in question here could assist the jury in determining whether the defendant intended to kill Horner when he shot and wounded him. A specific intent to kill is an essential element of assault with a deadly weapon with intent to kill inflicting serious injury. N.C.G.S. § 14-32(a) (1986); *see State v. Meadows*, 272 N.C. 327, 331, 158 S.E.2d 638, 640-41 (1968). Such expert opinion testimony is not rendered inadmissible on the basis that it embraces the issues of premeditation and deliberation and specific intent to kill, which are ultimate issues to be determined by the jury. N.C.G.S. § 8C-1, Rule 704 (1992); *Shank*, 322 N.C. at 249, 367 S.E.2d at 643. The State argues that the testimony of Dr. Brown that the defendant was incapable of forming a specific intent to kill was inadmissible, nevertheless, because it was testimony that a precise legal standard had been met. It is true that we have held that testimony by medical experts relating to precise legal terms such as "premeditation" or "deliberation," definitions

of which are not readily apparent to such medical experts, should be excluded. *State v. Weeks*, 322 N.C. 152, 166-67, 367 S.E.2d 895, 902-903 (1988). However, the term "specific intent to kill" is not one of those precise legal terms with a definition which is not readily apparent. Consequently, we have concluded previously that a medical expert may properly be allowed to testify to his or her opinion that a defendant could not form the specific intent to kill. *Rose*, 323 N.C. at 458, 373 S.E.2d at 428. The State's argument in this regard is, therefore, unpersuasive. Furthermore, the probative value of the expert's testimony was not substantially outweighed by any danger of confusing the issues, misleading the jury, or wasting time; therefore, this testimony was not excludable under Rule 403. N.C.G.S. § 8C-1, Rule 403 (1992); *see Shank*, 322 N.C. at 248-49, 367 S.E.2d at 643.

Because the excluded testimony of the psychiatric expert was relevant and was not rendered inadmissible by any of the North Carolina Rules of Evidence or by any other statutory or constitutional provision, the trial court erred in sustaining the prosecutor's objection to this testimony. The issue of the defendant's state of mind comprised his only defense, and the exclusion of this evidence substantially reduced his ability to defend himself against the charges of first-degree murder and assault with a deadly weapon with intent to kill. Although there was evidence that the defendant disliked Stanley Horner and that the defendant shot Alton Florence, the murder victim, after telling him he would "blow him away" if "the law came," such evidence would not preclude a reasonable jury's finding that the defendant lacked the capacity either to form a specific intent to kill or to premeditate and deliberate. Without determining whether the error committed by the trial court in the present case constitutes a violation of the defendant's rights under the Constitution of the United States, we conclude that the trial court's error in excluding expert testimony concerning the defendant's mental capacity was prejudicial. Even if the error does not rise to the level of a violation of the defendant's rights under the Constitution of the United States, the defendant was prejudiced, because there is a reasonable possibility that, absent the error, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988). Thus, without question, the error is prejudicial under the harmless error standard to be applied to violations of the defendant's rights under the Constitution of the United States; the error is not harmless beyond a reasonable doubt. N.C.G.S.

§ 15A-1443(b). Therefore, the defendant must receive a new trial on both the murder and assault charges.

[2] The defendant contends in his second assignment of error that the trial court erred by permitting the jury to listen to an audio tape recording of the defendant's telephone conversation with Orange County Sheriff Lindy Pendergrass and to read transcripts of that recorded conversation. We address this issue here because it is likely to arise again at the defendant's new trial.

The telephone conversation at issue occurred on 31 July 1990, the day after the shootings. The defendant called Sheriff Pendergrass. Another law enforcement officer tape-recorded most of the conversation, and a written transcript of the recording was made. The tape recording and copies of the transcript were admitted into evidence at trial, and the tape recording was played for the jury. The defendant's counsel objected to the playing of the tape because it included an exchange between the defendant and the Sheriff regarding whether anyone in Orange County had ever been executed and also included the defendant's statement during the conversation that "I know damn well when your deputies come after me, I know it's going to be me or them."

After reviewing the five-page written transcript of the taped conversation, the trial court reached the conclusion that "all of the contents contained in here are relevant. They are—it is competent, admissible evidence in its entirety, and there is nothing in here that is discussed that would be so inflammatory or prejudicial that it would outweigh the probative value of it." The defendant contends that the trial court's evidentiary rulings constitute an abuse of discretion.

The defendant argues that the playing of the tape created the danger of unfair prejudice, potential confusion of the issues, and needless presentation of cumulative evidence which required its exclusion under N.C.G.S. § 8C-1, Rule 403. Pursuant to Rule 403, a trial court in its discretion may exclude relevant evidence if the probative value of that evidence is "substantially outweighed" by its tendency to prejudice the defendant unfairly, to confuse the issues, to mislead the jury, or to waste time. State v. Mason, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986). The tape recording at issue in the present case was extremely probative. During the conversation, the defendant discussed problems he had experienced with his stepson, Stanley Horner. The defendant admitted shooting

IN RE BISSELL

[333 N.C. 766 (1993)]

Horner and the "other fellow" and stated that he told the "other guy" that he would "blow your f--ing head away" if "the law comes out here." The defendant also stated that he had shot Florence because Stanley Horner had called the law. The defendant stated, "that damn Stanley is the one I should have got, instead of that other one and that's where I messed up at right there." The defendant further stated that he hoped Horner died. This evidence was probative of the defendant's mental state at the time of the shootings. Although this evidence prejudiced the defendant, it was not unfairly prejudicial; evidence is unfairly prejudicial only if it unduly tends to suggest a decision on an improper basis, such as an emotional basis. *State v. DeLeonardo*, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986). The evidence of the defendant's telephone conversation with Sheriff Pendergrass suggested no improper basis for decision. The probative value of the evidence also was not substantially outweighed by any tendency of the evidence to confuse the issues, to mislead the jury, or to waste time. We conclude that the trial court did not abuse its discretion in overruling the defendant's objections under Rule 403 to the admission of this evidence.

For the reasons previously given in this opinion, the defendant must receive a new trial on the charges against him.

New trial.