STATE OF NORTH CAROLINA v. JAMES CARL RICHARDSON

No. 126A93

(Filed 6 October 1995)

**1. Homicide § 588 (NCI4th)— felony murder—imperfect self-defense—instruction not given—no error**

There was no error in a first-degree murder prosecution where the trial court refused to instruct the jury on imperfect self-defense on the felony murder charge. Self-defense, perfect or imperfect, is not a defense to first-degree murder under the felony murder theory, and only perfect self-defense is applicable to the underlying felonies, assault with a deadly weapon with intent to kill inflicting serious injury and discharging a weapon into occupied property. The purpose of the felony murder rule is to deter even accidental killings from occurring during the commission of a dangerous felony; to allow self-defense, perfect or imperfect, to apply to felony murder would defeat that purpose, and if a person is killed during the perpetration or attempted perpetration of a felony, then the defendant is guilty of first-degree felony murder, not second-degree murder or manslaughter.

**Am Jur 2d, Homicide § 519.**

**2. Evidence and Witnesses § 2302 (NCI4th)— felony murder—expert testimony as to intent—no prejudice**

There was no prejudicial error in a first-degree murder prosecution where a psychologist was not allowed to give an opinion as to whether defendant had the capacity to form the specific intent at the time of the shooting but defendant was convicted only of felony murder, which does not require an intent to kill as an element that must be satisfied for a conviction. Moreover, while the term "specific intent to kill" is not a precise legal term with a definition which is not readily apparent and a medical expert may properly be allowed to testify as to an opinion that a defendant could not form the specific intent to kill, there is no evidence that defense counsel here ever attempted to ask a question relating to defendant's specific intent to kill and did not at any point during the trial seek to make an offer of proof.

**Am Jur 2d, Expert and Opinion Evidence §§ 193, 194.**

**Admissibility of expert testimony as to whether accused had specific intent necessary for conviction. 16 ALR4th 666.**

**3. Evidence and Witnesses § 787 (NCI4th)— felony murder— testimony of threat to defendant—hearsay—exclusion not prejudicial**

There was no prejudicial error in a first-degree murder prosecution where the trial court sustained the State's objection to testimony by defendant that a member of the victim's family had threatened to kill defendant. Defendant elicited essentially the same evidence through other witnesses, including defendant's own voice and words referring to the threatening telephone call during negotiations between defendant and police.

**Am Jur 2d, Appellate Review § 753.**

**4. Jury § 194 (NCI4th)— felony murder—juror's traffic case dismissed by prosecutor—challenge for cause denied**

The trial court did not abuse its discretion in a first-degree murder prosecution by not dismissing for cause a juror whose traffic case was dismissed by one of the two prosecutors in this case while the trial was under way. The prosecutor dismissed the traffic charge in accordance with normal routine procedures for handling minor infractions once an insurer had verified payment of all claims, the trial court conducted an inquiry of the juror and the employee in the prosecutor's office who had witnessed the communication between the prosecutor and the juror, and the court found that the incident did not bias the juror in favor of the State and that the juror could be fair. Defendant did not establish that the judge's determination was so arbitrary that it could not have been the result of a reasoned decision.

**Am Jur 2d, Jury §§ 266, 267.**

**5. Criminal Law §§ 1216, 1240 (NCI4th)— assault—mitigating factors—provocation—threat—not found**

The trial court did not err when sentencing defendant for assault with a deadly weapon with intent to kill by not finding the mitigating factors of strong provocation and a threat insufficient to constitute a defense but which significantly reduced culpability where the evidence did not establish either as a matter of law.

**Am Jur 2d, Criminal Law §§ 598, 599.**

Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.

6. **Homicide §§ 612, 707 (NCI4th)— instructions—imperfect self-defense—voluntary manslaughter—reasonable belief in need to kill**

The trial court did not err by instructing the jury that it could return a verdict of voluntary manslaughter for imperfect self-defense only if defendant reasonably believed it was necessary to kill in self-defense. This issue has consistently been decided contrary to defendant's position; moreover, any error in the voluntary manslaughter instruction fails to rise to plain error since in finding defendant guilty solely of first-degree murder based on the felony murder rule the jury specifically rejected premeditated and deliberate murder, second-degree murder, and voluntary manslaughter.

**Am Jur 2d, Homicide § 519.**

7. **Appeal and Error § 164 (NCI4th)— criminal charges— sufficiency of evidence—no motion to dismiss at close of evidence**

There was no plain error in submitting charges of first and second-degree murder to the jury where defendant had moved to dismiss all charges at the close of the State's case but did not renew the motion at the close of all of the evidence. Although N.C.G.S. § 15A-1446(d)(5) provides that questions of insufficiency of the evidence may be the subject of appellate review even when no objection or motion has been made at trial, Rule 10(b)(3) of the Rules of Appellate Procedure provides that a defendant who fails to make a motion to dismiss at the close of all the evidence may not attack on appeal the sufficiency of the evidence at trial. To the extent that N.C.G.S. § 15A-1446(d)(5) is inconsistent with N.C. R. App. P. 10(b)(3), the statute must fail.

**Am Jur 2d, Appellate Review § 614; Trial §§ 905, 1053.**

8. **Appeal and Error § 155 (NCI4th)— cross-examination— details of prior conviction—no objection—issue not preserved**

Defendant did not preserve for appeal the question of whether the trial court erred by allowing the prosecutor's cross-examination of defendant regarding a prior conviction where the transcript does not clearly reflect that defendant objected to the

admitted statements, and no specific grounds for an objection were apparent from the context.

## Am Jur 2d, Trial § 406.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Guice, J., at the 4 January 1993 Criminal Session of Superior Court, Henderson County. Defendant's motion to bypass the Court of Appeals on his conviction for assault with a deadly weapon with intent to kill was allowed 5 May 1994. Heard in the Supreme Court 14 March 1995.

*Michael F. Easley, Attorney General, by William B. Crumpler, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor, Assistant Appellate Defender, for defendant-appellant.*

ORR, Justice.

On 28 March 1992, Denny Waters was shot and killed by defendant James Carl Richardson while sitting in the driver's seat of his car. Defendant also shot and wounded Ricky Waters, Denny's brother and a passenger in the car. The shooting was a culmination of a year-long obsessive pattern of behavior by defendant toward his ex-girlfriend, Renee Scherf. At the time of the shooting, Renee Scherf was dating Ronald Waters, the brother of Denny and Ricky.

Defendant was indicted for first-degree murder and for assault with a deadly weapon with intent to kill inflicting serious injury. He was tried capitally at the 4 January 1993 Criminal Session of Superior Court, Henderson County, and was found guilty of first-degree murder under the felony murder theory, with discharging a firearm into occupied property and assault with a deadly weapon with intent to kill inflicting serious injury as the underlying felonies. He was also found guilty of assault with a deadly weapon with intent to kill. After the jury returned its verdicts, the trial judge sentenced defendant to consecutive terms of life imprisonment on the conviction for first-degree murder and ten years' imprisonment for first-degree assault with a deadly weapon with intent to kill.

Defendant appeals the first-degree murder conviction to this Court, which subsequently granted defendant's motion to bypass the Court of Appeals on the assault conviction. Defendant presents no arguments related to the assault conviction. After reviewing the tran-

scripts, record and briefs, we find no error in defendant's assignments and, accordingly, uphold defendant's conviction for murder in the first degree and sentence of life imprisonment.

The State's evidence leading up to 28 March 1992, the day of the shooting, tended to show the following: Renee Scherf met defendant in December 1990 and began dating him in January 1991. They began living together shortly thereafter and continued to live together for two to three months until she moved into a trailer by herself located in the same trailer park where defendant lived.

In September 1991, Ms. Scherf met and began dating Ronald Waters. In an effort to keep her distance from defendant, who had begun harassing and stalking Mr. Waters, Ms. Scherf started visiting Mr. Waters at his Landrum, South Carolina, home, which was approximately twenty-six miles from where Ms. Scherf and defendant lived in Saluda, North Carolina. In November 1991, Ms. Scherf moved into Mr. Waters' home.

From approximately 22 March 1991 until 28 March 1992, defendant exhibited obsessive, harassing, threatening, stalking, and confrontational behavior towards Ms. Scherf, Ronald Waters, and the Waters' family at their homes, their places of employment, and numerous other locations. Such behavior was evidenced by incidents where defendant "chronically" called Ms. Scherf and followed Mr. Waters. Defendant issued threats to Mr. Waters such as stating that "no one come [sic] between him and his woman," that Mr. Waters "would pay dearly for what [he] [had] done," or asking Mr. Waters if Ms. Scherf was "worth getting killed over." Also during this one-year period, defendant shot out the front windshield and rear window of Mr. Waters' car and broke Mr. Waters' front windshield with a brick.

Specifically, Ms. Scherf testified that, on three occasions, she called defendant to appeal to him to leave her alone and to seek counseling. She testified that defendant responded to her attempts by telling her that "[e]ither [she] would get killed, Ron would get killed, [they] both would die, or [they] would break up." Defendant also stated that he would not stop harassing or following her and the Waters family until "he was satisfied," that his "mind was made up," and that she "can't appeal to [him]. [He's] beyond that now." Further, defendant stated that if any member of the Waters family came to the trailer park, he would "shoot them if they mess with [him]" and that if she and Mr. Waters did not break up, somebody was going to get hurt.

On another occasion, Ms. Scherf testified that defendant came to Mr. Waters' home when Ms. Scherf was there alone. After Ms. Scherf confronted defendant with a shotgun and yelled at him to leave her alone, defendant left a letter on the porch railing and disappeared. At trial, Ms. Scherf identified State's Exhibit No. 5 as the fourteen-page letter that defendant left for her on the evening of 25 March 1992, which she had turned over to the police. Ms. Scherf read the letter from defendant aloud at trial. In the letter, defendant stated:

I guess I'll start by saying this letter is I intended to explain why I feel why I have to do what I'm going to do. . . .

I still feel every bit of the love I had for you then, and now even more so. I know I had a lot to do with the way our relationship turned out and I'll accept most of the blame, but I know it was marred badly by the people who had influence on you. And when you told me the other night [w]hat my stepmother told you that infuriates me also, as hard as I was trying to win you over and getting your respect and trust everyone around us was blowing me out of the water. That's one of the reasons I'm doing what I'm doing. I'm going to teach them not to get involved and to leave people alone. I really was trying hard, Renee.

. . . .

. . . You said that the fellow has a big heart. No he doesn't, not unless it's only for women. He's never loved anyone as much as I love you, because if he did, his conscience would allow him enough compassion to know how I feel and he'd back out. All these things and more than I can stand to write are the reason for why I will do what I feel I have to do. These things, these feelings have haunted me ever since we've been apart and it's more than I can stand any more. It's enough to know that my faults were poison, but everyone else's involvement was totally unnecessary and it has kept me from the opportunity of redeeming myself to you. Well, when it's all finally done and over, maybe then everyone will know how much I loved you. I love you more than life itself and I hope you will always remember that. All my love, Jim.

The State also presented extensive witness testimony tending to show that, at various times, defendant harassed the Waters family by following or positioning himself near them. Sometimes children were in the vehicles that were followed. Specifically, on one occasion, Melinda Waters, Ronald Waters' sister, testified that she saw the bar-

rel of a gun in defendant's hand during one of her encounters with defendant.

On the day of the shooting, 28 March 1992, Melinda informed Ricky and Denny, two other brothers, that she had seen defendant's car parked up the street from their mother's house. Ricky got into Denny's car, and they went to check on defendant. Defendant's car was gone, so they drove uptown. Shortly thereafter, Melinda spotted defendant. Ricky and Denny followed Melinda to a Food Lion parking lot at the edge of Columbus. Ricky testified that the purpose in following her was to see where defendant went. They were concerned because defendant had been close to their mother's house when he had no business being there.

Denny and Ricky saw defendant come into the parking lot toward Melinda's car, so they pulled between defendant's car and Melinda's car. Ricky testified that they did not block defendant in, but rather, pulled between the two cars because it looked as though defendant was headed toward Melinda's car. Denny stopped, and he and Ricky exited the car. Denny told defendant that he wanted to talk to him. Defendant drove off suddenly, and Denny and Ricky followed.

Defendant proceeded onto Interstate 26 towards Hendersonville, North Carolina, with the Waters brothers following. Denny and Ricky discussed giving defendant "a dose of his own medicine." The vehicles subsequently left I-26 and got onto Highway 64, making a U-turn on the highway, and headed towards downtown Hendersonville. Defendant made another U-turn and went all the way through Hendersonville, running several red lights in the process. Denny and Ricky continued to follow him. Ricky testified that the drive through Hendersonville was not a high-speed chase and that Denny did not tailgate defendant.

Ricky further testified that eventually, at approximately 8:50 p.m., defendant stopped at a red light, and Denny stopped his car four or five feet behind defendant's car. Defendant got out of his car with a rifle in his hand; he walked towards the rear of his car and towards the front of Denny's car, pointing the gun at Denny and Ricky. As defendant approached them, nothing was said by anyone. Suddenly, defendant started firing the rifle straight towards Ricky and Denny. Ricky testified that defendant's first shot burst the windshield and that Denny was hit somewhere around his eye. Ricky testified that he reached for Denny and saw another shot coming from defendant's direction. Three shots were fired quickly with just a couple of sec-

onds between shots. Defendant returned to his car and drove off. Ricky was shot in his left shoulder, and Denny was fatally wounded. The front windshield had three bullet holes in it.

Defendant's version of the events surrounding the shooting contrasts with Ricky's. According to defendant, on the day of the shooting, he was being harassed and threatened by Melinda, Denny and Ricky. At one point, according to defendant, Denny ran up to defendant's car, tried to open defendant's door and told him to get out of the car. Then defendant testified that he "floored" the car. As he did, somebody hit his car or kicked it, making a noise like a thud or a thump at the back quarter panel.

Defendant testified that he then got on the highway and continued to the interstate. He headed straight up the interstate going north, with the Waters brothers following close behind him, maybe six or seven feet behind him. At one point, when they were side-by-side on I-26, defendant asked through his open window what they wanted. Defendant testified that one of the men shouted, "You know what we want," and either "We're going to kill your ass," or "We're going to kick your ass." Defendant then heard a loud noise that he testified sounded like a gunshot. Defendant accelerated and drove into downtown Hendersonville to look for a police officer, but did not see one. As he continued driving, he noticed that he was about to run out of gas. At that point, defendant testified that he "panicked." Defendant testified that he had his gun beside him and stopped the car. He cocked his Marlin .30-.30 rifle and exited his car. He looked at the Nissan and thought he saw the passenger (Ricky Waters) holding something shiny that he thought was a handgun. Defendant then raised the rifle to his hip and fired three times. He cocked the rifle a fourth time, but then decided not to shoot again. He got into his car, drove off, subsequently bought some gas, then drove home. After seven hours of negotiating with the police, defendant surrendered.

Harold Poston, M.D., a board-certified anatomic and clinical pathologist, performed the autopsy on Denny Waters. He testified that Denny suffered three separate injuries. He testified that Denny had a large wound that penetrated through the facial bones between the bridge of the nose and the corner of the left eye, and through the skull, disrupting or destroying much of the brain matter. Another wound was through the soft tissue of the neck that just grazed the neck bones and the base of the skull and may have caused some

impact damages on the base of the skull. The third wound was a defect across the cheek that could be called a graze wound.

Defendant brings forward eight assignments of error.

## I.

[1] In his first assignment of error, defendant contends that the trial court erred in not instructing the jury on imperfect self-defense on the felony murder charge. The trial court instructed the jury on perfect and imperfect self-defense on the charge of first-degree murder under the theory of malice, premeditation and deliberation. However, when the trial court instructed the jury on felony murder, it limited the self-defense instruction to perfect self-defense for the underlying felonies as embodied in the pattern jury instruction, N.C.P.I.—Crim. 308.45 (1986). Defendant does not complain about the form of these instructions; rather, he limits this assignment of error to the court's failure to instruct on imperfect self-defense for felony murder.

Our legislature has defined felony murder as:

A murder which shall be . . . committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree . . . .

N.C.G.S. § 14-17 (Supp. 1994). As this Court has stated, "premeditation and deliberation are not elements of the crime of felony-murder." *State v. Wall*, 304 N.C. 609, 613, 286 S.E.2d 68, 71 (1982). Thus, the elements necessary to prove felony murder are that the killing took place while the accused was perpetrating or attempting to perpetrate one of the enumerated felonies. "By not requiring the State to prove the elements of murder, the legislature has, in essence, established a *per se* rule of accountability for deaths occurring during the commission of felonies." *State v. Bell*, 338 N.C. 363, 386, 450 S.E.2d 710, 723 (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 861 (1995).

The felony murder rule was promulgated to deter even accidental killings from occurring during the commission of or attempted commission of a dangerous felony. The rationale of the felony murder rule is

that one who commits a felony is a bad person with a bad state of mind, and he has caused a bad result, so that we should not worry too much about the fact that the fatal result he accomplished was

quite different and a good deal worse than the bad result he intended.

*Wall*, 304 N.C. at 626, 286 S.E.2d at 78 (Copeland, J., dissenting).

In the instant case, defendant contends that his acts with respect to the underlying felonies (see the trial court's instruction below) were committed in self-defense and that the trial court instructed as to perfect self-defense on the underlying felonies submitted. He suggests that the trial court erred because the trial court believed that the doctrine of self-defense in felony murder is limited to the application of that doctrine to the underlying felonies, and imperfect self-defense does not apply to those felonies.

The trial court instructed as follows:

[I]f you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant intentionally, and not in self-defense, committed the felony of discharging a firearm into an occupied motor vehicle, or committed the felony of assault with a deadly weapon with intent to kill inflicting serious injury, or the felony of assault with a deadly weapon with intent to kill, or the felony of assault with a deadly weapon inflicting serious injury, and that while committing the felony of discharging a firearm into an occupied motor vehicle, or the felony of assault with a deadly weapon with intent to kill inflicting serious injury, or the felony of assault with a deadly weapon with intent to kill, or the felony of assault with a deadly weapon inflicting serious injury, the defendant killed a victim and that the defendant's act was a proximate cause of the victim's death and that the discharging of firearm into an occupied motor vehicle, or the assault with a deadly weapon with intent to kill inflicting serious injury, or the assault with a deadly weapon with intent to kill, or the assault with a deadly weapon inflicting serious injury were committed or attempted with the use of a deadly weapon and that the defendant did not act in self-defense, it would be your duty to return a verdict of guilty of first degree murder based on the felony murder rule.

However, if you do not so find or have a reasonable doubt as to one or more of these things, you will not return a verdict of guilty of first degree murder based on the felony murder rule.

The jury found defendant guilty of first-degree murder based on the felony murder rule and then indicated that the felonies underlying the

conviction of first-degree murder based on the felony murder rule were discharging a firearm into occupied property and assault with a deadly weapon with intent to kill inflicting serious injury. However, had the jury found that defendant acted in self-defense on the underlying felonies submitted, it could not have found defendant guilty of felony murder.

We hold that the trial court correctly instructed on the felony murder rule and on self-defense as it related to the underlying felonies. Self-defense, perfect or imperfect, is not a defense to first-degree murder under the felony murder theory, and only perfect self-defense is applicable to the underlying felonies.

Defendant relies on a line of decisions of this Court culminating in *State v. Bell*, 338 N.C. 363, 450 S.E.2d 710, as supporting the applicability of self-defense to first-degree murder under the theory of felony murder and, thus, the need to instruct on imperfect self-defense during the felony murder jury charge. In North Carolina, imperfect self-defense arises

> if the defendant believed it was necessary to kill the deceased in order to save himself from death or great bodily harm, and if the defendant's belief was reasonable because the circumstances at the time were sufficient to create such a belief in the mind of a person of ordinary firmness, but the defendant, although without murderous intent, was the aggressor or used excessive force, the defendant would have lost the benefit of perfect self-defense. In this situation he would have shown only that he exercised the imperfect right of self-defense and would remain guilty of at least voluntary manslaughter. *State v. Wilson*, 304 N.C. 689, 695, 285 S.E.2d 804, 808 (1982).

*State v. Bush*, 307 N.C. 152, 159, 297 S.E.2d 563, 568 (1982). Upon review, we conclude that the cases upon which defendant relies should be read to mean that self-defense is available in felony murder cases only to the extent that self-defense relates to applicable underlying felonies as in the case *sub judice*.

As previously stated, the purpose of the felony murder rule is to deter even accidental killings from occurring during the commission of a dangerous felony. To allow self-defense, perfect or imperfect, to apply to felony murder would defeat that purpose, and if a person is killed during the perpetration or attempted perpetration of a felony, then the defendant is guilty of first-degree felony murder—not

second-degree murder or manslaughter. It is only certain applicable underlying felonies that can be subject to an instruction on perfect self-defense. An imperfect self-defense instruction would not be proper. This assignment of error is overruled.

## II.

**[2]** Defendant's next assignment of error is that the trial court erred in refusing to permit the psychologist to give an opinion as to whether defendant had the capacity to form the specific intent to kill at the time of the shooting. Defendant contends that the trial court's ruling was prejudicial in light of *State v. Daniel*, 333 N.C. 756, 429 S.E.2d 724 (1993), *State v. Clark*, 324 N.C. 146, 377 S.E.2d 54 (1989), and *State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988). Defense counsel's stated purpose for offering expert testimony was (1) to establish defendant's incapacity to deliberate at the time of the crime, and (2) to establish defendant's state of mind as it concerned his fear of death or great bodily harm. The State contends that defendant has not preserved this issue for appellate review and that, even if he has, the jury's verdict renders it moot. We agree with the State's contentions.

While we have held "that testimony by medical experts relating to precise legal terms such as 'premeditation' or 'deliberation,' definitions of which are not readily apparent to such medical experts, should be excluded," *Daniel*, 333 N.C. at 763-64, 429 S.E.2d at 729, we concluded that

the term "specific intent to kill" is not one of those precise legal terms with a definition which is not readily apparent. Consequently, we have concluded previously that a medical expert may properly be allowed to testify to his or her opinion that a defendant could not form the specific intent to kill.

*Id.* at 764, 429 S.E.2d at 729. After examining the record as a whole, we conclude that there is no evidence that defense counsel ever attempted to ask a question relating to defendant's specific intent to kill. Moreover, at no point during the trial did defense counsel seek to make an offer of proof, as required by N.C.G.S. § 15A-1446(a), to preserve the substance of any specific intent to kill testimony for appellate review.

Defense counsel did specifically ask Dr. Sansbury whether he had an opinion as to defendant's state of mind during the chase and at the time of the shooting. Dr. Sansbury stated:

What I saw was this kind of fear, this disintegration of ego. When I say that, that is the inability to—to—to maintain self-control, that he was starting to fall apart. He tried to avoid the situation. He tried to make sure that he didn't have to express his aggression directly. He hunted for a policeman.

But I think what happened was that he got pushed to the point where his psychological defenses were no longer working and then his reality testing started to deteriorate, and at that point in time I think what happened was we saw the kind of the borderline elements become a part of that. When he finally could not defend against the situation any more and felt like he was going to have to have a showdown with these guys, he started experiencing all this anger that had been there for many years. And so when he killed these people, shot this man, at that point in time, he was doing the only thing he thought he could do.

Dr. Sansbury further testified that defendant's fear and rage overwhelmed his defense mechanisms and concluded that at that time, defendant could not form any plans that were outside his fear and rage. Any plans would be impulsive, inefficient and poorly organized.

Defendant has failed to establish that exclusion of potential "specific intent to kill" testimony was so erroneous as to be prejudicial. Ultimately, defendant was convicted only of felony murder, not first-degree premeditated and deliberate murder. Felony murder, by its definition, does not require "intent to kill" as an element that must be satisfied for a conviction. *See State v. Beamer,* 339 N.C. 477, 481, 451 S.E.2d 190, 192 (1994). Therefore, evidence that defendant could form no such intent had no effect on defendant's conviction. We, therefore, overrule this assignment of error.

## III.

[3] Defendant's third assignment of error is that the trial court erred by sustaining the State's objection to testimony by defendant that a member of the Waters family had threatened to kill him. During defendant's testimony on direct examination, defense counsel asked defendant about a telephone call defendant received on the night of 14 January 1992 from a man who identified himself as Ronald Waters' brother, although the caller did not give his name. The particular question the prosecutor objected to was, "What did he tell you?" contending that the substance of the call was inadmissible hearsay. Defense counsel stated that the evidence was not being offered for

the truth of the matter, but instead to prove defendant's state of mind after he received the call and to explain why he started carrying a gun. The court sustained the prosecutor's objection.

On *voir dire*, defendant testified that the caller asked defendant why he was giving Ronald so many problems and why defendant had shot out the windows of Ronald's car. The caller then said, "I'm going to come up there and . . . I'm not going to shoot your windows out. I'm going to shoot your brains out." Defendant further testified outside the presence of the jury that, based on the call, he started carrying a gun every day. He said he did not know who might be threatening him "other than it was a member of the [Waters] family . . . or professed to be." As a result of the call, he was scared.

The trial court sustained the prosecutor's objection and allowed defendant to testify only that defendant received a telephone call and that after the call, he was scared and began to carry a gun. After all the evidence was presented, the trial court entered an order on the record giving its reason for the ruling.

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. N.C.G.S. § 8C-1, Rule 801(c) (1992). However, as this Court stated in *State v. Reid*, it is well established that

> [w]hen evidence of a statement by someone other than the testifying witness is offered for a purpose other than to prove the truth of the matter asserted, the evidence is not hearsay. Statements of one person to another are not hearsay if the statement is made to explain the subsequent conduct of the person to whom the statement was made.

*Reid*, 335 N.C. 647, 661, 440 S.E.2d 776, 784 (1994) (citation omitted). Assuming *arguendo* that the trial court erred in not allowing the statement to be admitted, the error was harmless because defendant elicited substantially the same evidence through other witnesses.

> "It is a well-settled rule that 'if a party objects to the admission of certain evidence and the same or like evidence is later admitted without objection, the party has waived the objection to the earlier evidence.' " *State v. Wingard*, 317 N.C. 590, 599, 346 S.E.2d 638, 644 (1986) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 30 (1982)).

*Reid*, 335 N.C. at 663, 440 S.E.2d at 785.

In this case, Renee Scherf was asked on cross-examination whether defendant told her that some man had called him and threatened to "blow his brains out." She responded affirmatively. She further testified that defendant said that although the caller was anonymous, he thought or knew it was Stevie Waters, one of Ronald's brothers. He knew it was the Waters family threatening him, telling him that if he did not stay away, they would kill him. Renee further testified that defendant seemed scared by the call and that it was in this context that he said that he would defend himself if he had to.

Dr. Sansbury also testified that defendant described a threatening phone call he had received in mid-January. Dr. Sansbury thought defendant said it was from Ms. Scherf's boyfriend's brother. Dr. Sansbury testified that at that time, defendant feared for his life and felt as though his life was threatened and, thus, started carrying a gun with him. As corroborative evidence, defendant's father testified that defendant told him he had received a death threat from the Waters family. Detective Norton testified that defendant's father told him that defendant had received death threats from the Waters family. Finally, additional evidence of the alleged threatening phone call was presented to the jury through the tape recording and transcript of the telephone negotiations between defendant and police. The tape and transcript include defendant's statement that Ronald's brother threatened his life and said he was going to "blow [defendant's] brains out." The jury had before it defendant's own words and voice from the tape and transcript referring to the threatening phone call, even if it did not have his full testimony in this regard, as well as ample evidence from several other reliable witnesses. This assignment of error is overruled.

## IV.

[4] Defendant's fourth assignment of error is that the trial court abused its discretion when it denied defendant's challenge for cause of an impaneled juror. The juror's traffic case was dismissed by one of the two prosecutors in this case while the trial in the instant case was under way. Defendant contends that the contact was sufficient for a challenge for cause because of the appearance of impropriety. We disagree.

While there is no statutory provision covering the situation when a party seeks to challenge a juror after impanelment, *State v. McLamb*, 313 N.C. 572, 575, 330 S.E.2d 476, 478 (1985), N.C.G.S. § 15A-1215(a) allows the trial court to replace a juror with an alter-

nate juror should the original one become disqualified or be discharged for some reason.

When a juror has contact with someone who may have an interest in the case, the judge has the duty "to determine whether such contact resulted in substantial and irreparable prejudice to the defendant. It is within the discretion of the trial judge as to what inquiry to make." *State v. Willis*, 332 N.C. 151, 173, 420 S.E.2d 158, 168 (1992).

> The trial court has the opportunity to see and hear the juror on *voir dire* and, having observed the juror's demeanor and made findings as to his credibility, to determine whether the juror can be fair and impartial. For this reason, among others, it is within the trial court's discretion, based on its observation and sound judgment, to determine whether a juror can be fair and impartial.

*State v. Yelverton*, 334 N.C. 532, 543, 434 S.E.2d 183, 189 (1993) (citation omitted). Absent a showing that the trial court's decision was so arbitrary that it could not have been the result of a reasoned decision, *McLamb*, 313 N.C. at 576, 330 S.E.2d at 479, the decision must stand. The test is whether the challenged juror is "unable to render a fair and impartial verdict." N.C.G.S. § 15A-1212(9) (1988).

On 11 January 1993 while the trial was under way, prosecutors Alan Leonard and Jill Rose notified the trial court that one of the jurors had had contact that morning with Ms. Rose concerning a traffic citation that the juror had received on 25 November 1992. At an earlier appearance in district court, the juror did not have the paperwork she needed from her insurance company. Consequently, at a later date, she took the insurance letter to the district attorney's office, where she happened to encounter Ms. Rose. Ms. Rose referred her to an employee, who proceeded to read the letter to Ms. Rose. Ms. Rose then stated that the letter was "adequate." The employee took the ticket, and the juror went back into the courtroom to continue with this trial. In accordance with normal routine procedures for handling minor infractions once an insurer had verified payment of all claims, the prosecutor dismissed the traffic charge against the juror. The trial court conducted an inquiry of the juror and the employee in the prosecutor's office who had witnessed the communication between the juror and Ms. Rose. During *voir dire*, the trial court asked the following questions of and elicited the following responses from the challenged juror:

THE COURT: Your involvement with this case, with the district attorney's office, that is your own personal matter. Is that going to have any influence on your verdict in the case that you're now sitting on, this first degree murder case and assault with a deadly weapon with intent to kill, inflicting serious injury?

JUROR: No, sir.

THE COURT: That is not going to cause you to lean any more to the state than you would to the defendant?

JUROR: No, sir.

THE COURT: Are you telling me that you will not be influenced in anything in this case except by the evidence as it is produced here in court?

JUROR: Right.

. . . .

MR. LEONARD: You're saying then that you're still in a position to be a fair and impartial juror in this case, ma'am?

JUROR: Oh, yes.

. . . .

The trial court made findings of fact consistent with the testimony of the juror and the employee except the trial court found that the juror's initial contact with the employee occurred before 17 December 1992. The trial court found that the incident did not bias the juror in favor of the State and that she could be a fair juror. Thus, we hold that defendant has not established that the judge's determination of the juror's continuing fitness "was so arbitrary that it could not have been the result of a reasoned decision." *McLamb*, 313 N.C. at 576, 330 S.E.2d at 479. This assignment of error is overruled.

## V.

[5] Defendant's fifth assignment of error is that the trial court erred in failing to find as statutory mitigating factors (1) that the defendant committed the offense of felonious assault under a threat which was insufficient to constitute a defense but significantly reduced his culpability, N.C.G.S. § 15A-1340.4(a)(2)(b) (1988); and (2) that the defendant acted under strong provocation, N.C.G.S. § 15A-1340.4(a)(2)(i). In *State v. Jones*, this Court held that under the Fair Sentencing Act, a trial court must find a statutory mitigating fac-

tor if that factor is supported by uncontradicted, substantial, and credible evidence. *Jones*, 309 N.C. 214, 218-19, 306 S.E.2d 451, 454 (1983). "To show that the trial court erred in failing to find a mitigating factor, the evidence must show conclusively that this mitigating factor exists, i.e., no other reasonable inferences can be drawn from the evidence." *State v. Canty*, 321 N.C. 520, 524, 364 S.E.2d 410, 413 (1988). Even "uncontradicted, quantitatively substantial and credible evidence may simply fail to establish, by a preponderance of the evidence, any given factor in aggravation or mitigation. While evidence may not be ignored, it can be properly rejected if it fails to prove, as a matter of law, the existence of the mitigating factor." *State v. Blackwelder*, 309 N.C. 410, 419, 306 S.E.2d 783, 789 (1983).

In the instant case, defendant argues that only one inference can be drawn from the evidence presented at trial— that defendant shot in reaction to the Waters brothers' threats and provocation. We disagree.

Defendant's evidence, if believed, showed at best that on 28 March 1992, Denny and Ricky Waters blocked defendant's car in a parking lot in Columbus; that Denny and Ricky Waters then chased defendant on I-26 from Columbus to Hendersonville; that they continued to chase defendant in Hendersonville through red lights and U-turns; that Ricky Waters admitted that they intended to beat defendant up that night, "to whip his ass"; that police found a loaded pistol in their car after the shooting, with the barrel pointing up between the open center console and the driver's seat; and that Ricky Waters admitted that their conduct in chasing defendant made defendant "snap."

On the other hand, the State's evidence showed that defendant was obsessed with Renee and Ronald's relationship and that he sought to provoke a confrontation on numerous occasions. More importantly, on the night of the shooting, several witnesses testified that defendant did not look nervous, frightened, excited, upset or shaking; that there was no hollering, screaming or words shouted back and forth between the two vehicles; that Denny and Ricky did not threaten defendant in any way; that their windows did not come down; that the car doors of the Nissan did not open; that the Waters brothers did not try to exit their car before defendant exited his car; that no one was around the Waters' car; that the road was free and clear with respect to defendant's vehicle; that defendant was aiming a high-powered .30-.30 rifle when he fired all three shots; that no one

returned fire at the defendant, threw a knife or rock, or exhibited any other aggressive behavior toward the defendant; and that after the third shot, defendant got into his car, hesitated a moment and then drove off in a fairly normal manner.

Therefore, we hold that the evidence does not establish as a matter of law the existence of either mitigating factor. The evidence entitled the trial court to reject defendant's version of the events surrounding the shooting and supported the decision to not submit the challenged mitigating factors. This assignment of error is overruled.

## VI.

[6] Next, defendant contends that the trial court committed plain error by instructing the jury that it could return a verdict of voluntary manslaughter for imperfect self-defense only if defendant reasonably believed it was necessary to kill in self-defense. That is, unless defendant had a reasonable belief in the need to kill Denny Waters in self-defense, the only homicide offenses for which he could be convicted were first-degree or second-degree murder. Defendant concedes that this issue has consistently been decided contrary to his position. *State v. Moore,* 339 N.C. 456, 465, 451 S.E.2d 232, 236-37 (1994); *State v. Rose,* 335 N.C. 301, 330, 439 S.E.2d 518, 534, *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 883 (1994); *State v. Maynor,* 331 N.C. 695, 700, 417 S.E.2d 453, 456 (1992); *State v. McAvoy,* 331 N.C. 583, 601, 417 S.E.2d 489, 500-01 (1992). We decline defendant's request to revisit our earlier, well-reasoned holdings in *Rose, McAvoy,* and *Maynor.*

Moreover, "any error in the voluntary manslaughter instruction fails to rise to plain error since in finding defendant guilty solely of first-degree murder based on the felony-murder rule, the jury specifically rejected premeditated and deliberate murder, second-degree murder, and voluntary manslaughter." *Moore,* 339 N.C. at 465, 451 S.E.2d at 237. This assignment of error is overruled.

## VII.

[7] Defendant's seventh assignment of error is that the trial court committed plain error by submitting the charges of first-degree and second-degree murder to the jury. Defendant moved to dismiss all charges at the close of the State's case for insufficient evidence. The trial court denied the motion. Defendant did not renew his motion to dismiss at the close of all the evidence. Thus, under Rule 10(b)(3) of the North Carolina Rules of Appellate Procedure, the issue of insuffi-

ciency was not preserved for appellate review. N.C.G.S. § 15A-1446(d)(5) provides that questions of insufficiency of the evidence may be the subject of appellate review even when no objection or motion has been made at trial. However, Rule 10(b)(3) provides that a defendant who fails to make a motion to dismiss at the close of all the evidence may not attack on appeal the sufficiency of the evidence at trial. We have specifically held in this regard that: "To the extent that N.C.G.S. § 15A-1446(d)(5) is inconsistent with N.C. R. App. P. 10(b)(3), the statute must fail." *State v. Stocks*, 319 N.C. 437, 439, 355 S.E.2d 492, 493 (1987). This assignment of error is overruled.

## VIII.

**[8]** Defendant's final assignment of error is that the trial court erred in overruling defense counsel's objection to the prosecutor's cross-examination of defendant about what defendant asserts were details of a prior conviction.

During direct examination, defendant testified that he had a prior conviction in Hendersonville in 1982 for maintaining a vehicle for possession of marijuana. Defendant did not testify on direct examination about any details of the conduct for which he was convicted. On cross-examination, the prosecutor asked, "And you had a pistol wrapped up in a shirt under the seat with the marijuana?" Defendant answered, "Yes, I did." In the next entry in the trial transcript, the trial court declared "Overruled." The trial transcript does not contain an objection by defense counsel.

In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context.

N.C. R. App. P. 10(b)(1). Here, the transcript does not clearly reflect that defendant even objected to the admitted statements, and no specific grounds for an objection were apparent from the context. *State v. Howell*, 335 N.C. 457, 471, 439 S.E.2d 116, 124 (1994). Defendant has, therefore, failed to preserve the question for appellate review. Accordingly, this assignment of error is overruled.

In summary, defendant was convicted by a jury after a fair trial, free from prejudicial error.

NO ERROR.