STATE OF NORTH CAROLINA v. MICHAEL HARRISON HUNT, JR.

No. COA08-1377

(Filed 4 August 2009)

**1. Criminal Law— instruction on felony murder—self defense not undermined**

The trial court did not err by instructing the jury on felony murder where defendant argued that the instruction undermined his self-defense claim and deprived defendant of consideration of voluntary manslaughter. The instructions clearly placed the burden of proof on the State for self-defense, both as to the degree of homicide and the firing into an occupied vehicle.

**2. Criminal Law— extension of session—no formal order**

The trial court sufficiently complied with N.C.G.S. § 15A-1238, and the judgments against defendant were not null and void as being entered out of term, where there was no formal written order of the trial court's extension of the session from one week to the next, but the trial court repeatedly announced that it was recessing court with no objection by defendant.

**3. Jury— polling—one question for two convictions—proper**

The jury was properly polled where the clerk asked each juror one question about agreement with the guilty verdict for both of the offenses of which defendant was convicted, rather than asking a separate question for each offense.

**4. Jury— selection—comment on gunplay in Durham**

The trial court did not abuse its discretion by not striking the entire jury panel where a prospective juror commented that there was too much gunplay in Durham. Firearms were clearly going to be a part of the trial and the issue was throughly explored during *voir dire*, but defendant did not articulate why a generalized observation about gun violence by a potential juror was so damaging that a new trial was required.

**5. Homicide— short-form indictment—first-degree murder—sufficiency**

A short-form indictment for first-degree murder conferred jurisdiction.

Appeal by Defendant from judgment entered 20 March 2008 by Judge Howard E. Manning, Jr., in Durham County Superior Court. Heard in the Court of Appeals 22 April 2009.

*Attorney General Roy Cooper, by Special Deputy Attorney General Steven M. Arbogast, for the State.*

*Geoffrey W. Hosford, for Defendant.*

BEASLEY, Judge.

Defendant (Michael Hunt) was indicted in April 2007 for discharging a firearm into an occupied vehicle, in violation of N.C. Gen. Stat. § 34.1, and for the first-degree murder of Adam Christopher Lutz (Lutz). He was tried before a Durham County, North Carolina, jury in March 2008. Following the presentation of evidence, Defendant was found guilty of first-degree murder under the felony murder rule and of discharging a firearm into an occupied vehicle. He was sentenced to life imprisonment without parole for first-degree murder. Judgment was arrested on the conviction of discharging a firearm into an occupied vehicle. From these convictions and judgment, Defendant appeals. We find no error.

Defendant and Lutz met each other in 2001, when they attended the same Durham high school. The two were often at odds, though they had mutual friends. Between 2001 and 2006, Lutz and Defendant had several fist fights and engaged in minor altercations involving bottle-throwing, rude comments, or pushing and shoving. Lutz and Defendant were part of a group of people who often saw each other at a particular Mobil gas station in Durham, and several of the conflicts between Defendant and Lutz took place at this gas station.

On the night of 8 August 2006 Lutz drove to Nicole Smith's residence. Nicole Smith, a sixteen-year-old acquaintance of both Lutz and Defendant, lived with her grandparents at 1501 Centennial Drive. Several other young people were at the house, including Smith's brother and cousin, the cousin's girlfriend, Defendant, and Defendant's friend, Tyrone Baker. Defendant and Baker had brought semi-automatic weapons to Smith's house. Between 9:00 and 10:00 p.m., Defendant called his friend Kyle Knight who agreed to drive to Smith's and pick up Defendant and Baker. Before Knight arrived, Defendant and Baker left Smith's house and walked down Centennial Drive. After a few minutes, Lutz's truck drove past Defendant and, at about the same time, Knight sped past in his car. Defendant and Baker veered from the roadway into a steep wooded

area. From this location, Defendant fired repeated shots at Lutz's truck. A bullet struck Lutz in the back of his head and Lutz died of the resulting injuries.

This general outline of the events of 8 August 2001 is undisputed. In addition, the State presented the following evidence: Brooke Thomas testified that she was Lutz's girlfriend and was with him on 8 August 2006. During the evening, Lutz received a phone call from Smith, who asked him to come to her house. As they drove down Centennial Drive, a car sped past them. A few seconds later, Thomas heard gunshots and saw Lutz lying with his head tipped to the side, bleeding from a head wound. She tried to steer the truck, but it veered from the road and hit a tree. Thomas called the police and waited for an ambulance to arrive. On cross-examination Thomas testified that Lutz kept a gun in his car, that he was addicted to drugs, and that she had taken out a domestic violence protective order against him.

Nicole Smith testified that on 8 August 2006 she spoke with Lutz by phone about selling or giving Lutz some pills. She denied asking Defendant to bring a gun to her house or to stay there to protect the residents from vandalism. A few minutes after hearing gunshots, Smith saw Defendant running down the street carrying a "long black gun." Smith was charged with first-degree murder of Lutz, but pled guilty to conspiracy to commit armed robbery. On cross-examination, Smith admitted that she had used and sold drugs, and that she initially lied to the police about Lutz's death.

Janeen Webb, Defendant's girlfriend, testified that she and another girl were with Knight on the night of 8 August 2006, when Knight drove to Smith's house. As they drove down Centennial Drive, the Defendant and Baker approached them and got in the car. The group went to the home of another friend, Stephen Penny. At Penny's, Defendant gave Webb some clothes to wash; however, she did not wash them and later gave the clothes to law enforcement officers. Webb pled guilty to obstruction of justice.

Defendant's most important evidence was his own testimony. Defendant told the jury that he shot Lutz because he was afraid for his life and thought Lutz was about to shoot him. He testified about a number of occasions when Lutz was rude, violent, or threatening towards him. On 30 July 2006, while Lutz and Defendant were both at the local Mobil station, Lutz threatened Defendant with a gun. Later that week, Defendant was asked to stay at Smith's house to

**STATE v. HUNT**

[198 N.C. App. 488 (2009)]

help the residents deal with recent acts of vandalism. He and Baker went there on 7 August 2006, bringing semi-automatic weapons in order to "apprehend the people who were vandalizing" and then "hold them until the police got there." They stayed overnight and were still at Smith's the following evening, 8 August 2006. Defendant and Smith had an argument and Defendant asked Knight to come get him and Baker.

While they were waiting for Knight, Defendant and Baker started walking down Centennial Drive. When Lutz drove by in his truck, Defendant and Baker "jumped off in the woods." Lutz put his truck into reverse gear and started backing down the street towards Defendant and Baker. Defendant testified that as Lutz approached he thought he saw Lutz's passenger side window being lowered and that "the next thing [he] expected to happen was a gun to come out the window and to start shooting at [them]." Defendant began shooting at Lutz's truck and continued until he ran out of ammunition. He testified that he had not planned to ambush Lutz and that he shot Lutz only because he was afraid for his life.

[1] Other evidence will be discussed as pertinent to the issues raised on appeal. The trial evidence unequivocally established that Lutz died of a gunshot wound, and Defendant admitted at trial that he shot Lutz. Thus, the key factual issue for the jury was whether Defendant acted in self-defense. Defendant argues that the trial court erred by instructing the jury on the felony murder theory of first-degree murder, on the grounds that this instruction undermined his self-defense claim and "effectively deprived [Defendant] of jury consideration of the charge of voluntary manslaughter." We disagree.

The trial court charged the jury on conspiracy to commit first-degree murder, first-degree murder, second-degree murder, voluntary manslaughter, and firing into an occupied vehicle. We conclude that it was proper to instruct the jury on first-degree murder under the felony murder rule.

Under N.C. Gen. Stat. § 14-17 (2007), a murder "committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnaping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first[-]degree[.]" The Supreme Court of North Carolina has held that:

> the purpose of the felony murder rule is to deter even accidental killings from occurring during the commission of a dangerous

felony. To allow self-defense, perfect or imperfect, to apply to felony murder would defeat that purpose, and if a person is killed during the perpetration or attempted perpetration of a felony, then the defendant is guilty of first-degree felony murder—not second-degree murder or manslaughter.

*State v. Richardson*, 341 N.C. 658, 668-69, 462 S.E.2d 492, 499 (1995). The Supreme Court of North Carolina "has expressly upheld convictions for first-degree felony murder based on the underlying felony of discharging a firearm into occupied property." *State v. Wall*, 304 N.C. 609, 612, 286 S.E.2d 68, 71 (1982).

Defendant contends that because "the evidence indicated that, at most, [Defendant] acted in imperfect self[-]defense" the trial court erred by instructing the jury that it could convict Defendant of first-degree felony murder. However, Defendant conceded at trial that he shot Lutz with a semi-automatic rifle, which he fired repeatedly until he ran out of ammunition. It is undisputed that Defendant shot Lutz from a wooded area, and that during this incident Lutz did not threaten Defendant or fire a weapon. There was other evidence from which the jury might find that Defendant could not see who was in the truck and did not know if Lutz was driving or if he had a gun. Defendant made no attempt to move farther into the woods or hide from Lutz in the underbrush, and did not try to talk to the people in the truck before he began shooting. It is undisputed that when Defendant began firing repeatedly at Lutz's truck, Defendant had not been threatened by anyone in the truck and had not seen a firearm in the truck. Moreover, the jury was not required to believe Defendant's testimony that he had been afraid for his life, or that he acted in self-defense. We conclude that there was sufficient evidence to submit the offense of discharging a firearm into an occupied vehicle to the jury, and thus to submit the question of Defendant's guilt of felony murder.

We also conclude that the trial court's instructions did not deprive Defendant of the benefit of his self-defense claim. The trial court defined self-defense and the related issues of whether Defendant was the aggressor or used excessive force, and also instructed the jury that the State had the burden of proving Defendant's guilt beyond a reasonable doubt. In its charge on premeditated and deliberated first-degree murder and lesser included offenses, the trial court instructed the jury, *inter alia*, that:

> The State has the burden of proving that Defendant <u>did not</u> act in self defense.

In deciding whether Defendant acted in self defense, the jury could consider whether Lutz was armed and whether he had a reputation for violence or danger.

If the State failed to prove that Defendant either did not act in self defense or that, even if he acted in self defense, Defendant was either the aggressor or used excessive force, then Defendant would not be guilty of any homicide.

If the State proved that, although Defendant acted in self defense, he either used excessive force or was the aggressor, the most he could be·guilty of would be voluntary manslaughter.

The trial court repeated several times that it was the State's burden to prove that Defendant did not act in self-defense, and that Defendant would not be guilty of first-degree premeditated murder absent proof that he did not act in self-defense.

In its charge on first-degree felony murder, the trial court instructed the jury that Defendant could not be found guilty of a felony murder unless the State proved Defendant's commission of the predicate felony beyond a reasonable doubt. Regarding the predicate felony of discharging a firearm into an occupied vehicle, the jury was instructed that the State had the burden of proving that Defendant did not shoot at Lutz's truck in self-defense. This instruction was repeated both as part of the instruction on felony murder, and in the separate instruction on the offense of firing into an occupied vehicle.

In its summation instruction as to each offense, the trial court reiterated that, unless the State were able to prove beyond a reasonable doubt that Defendant did not act in self-defense, he could not be convicted of the offense. We conclude that the trial court's instructions clearly placed the burden of proof on the State with regards to self-defense, both as to the degrees of homicide and also as regards firing into an occupied vehicle. This assignment of error is overruled.

---

**[2]** Defendant next argues that the judgments entered against him are "null and void" on the grounds that the jury's verdicts were entered "out of term." We disagree.

The trial court explained that Defendant was charged with murdering Lutz, and read the list of possible witnesses. The trial court also told the potential jurors that:

Now, this case, as you might imagine, is not going to be something we can try in today and tomorrow, in two days. Given the number of witnesses, it more likely than not will last awhile. This case, in court parlance, will go over. And that term means that it will go into next week. . . . I anticipate that we ought to be through with this matter before the end of next week[.] . . .

The trial began on Wednesday, 12 March 2008, and at 5:50 p.m. and the trial court declared the court to be "in recess" until the following day. The trial resumed on 13 March 2008, and at 5:00 p.m. dismissed the jury and announced that "we are in recess until the morning." As the trial court had originally predicted, the trial was not over by 5:00 p.m. Friday, 14 March 2008. The court dismissed the jury, stating "[l]et the record reflect that the jurors have left, and we are in recess until 10:15 Monday morning." Defendant's trial resumed on Monday, 17 March 2008. At the completion of the trial on Thursday, 20 March 2008, the proceedings were adjourned.

Defendant did not object to any of the court's statements about the length of trial nor to the court's rulings recessing court from day to day until the trial was over. However, on appeal, he argues that, because the court did not enter a formal written order extending the term of court beyond 14 March 2008, the verdicts were entered "out of term" and that the verdicts and judgment "are null and void and should be vacated."

"Preliminarily, we note that, although the words are frequently used interchangeably, 'term' in this jurisdiction generally refers to the typical six-month assignment of superior court judges to a judicial district, while 'session' designates the typical one-week assignment to a particular location during the term." *State v. Smith*, 138 N.C. App. 605, 607-08, 532 S.E.2d 235, 237 (2000) (citation omitted). Therefore, although Defendant argues that the verdicts and judgment were entered "out of term," his contention is more properly characterized as an argument that the judgment was entered "out of session."

The trial court's extension of a session of court is governed by N.C. Gen. Stat. § 15-167 (2007), which provides in pertinent part:

Whenever a trial for a felony is in progress on the last Friday of any session of court and it appears to the trial judge that it is unlikely that such trial can be completed before 5:00 P.M. on such Friday, the trial judge may extend the session as long as in his opinion it shall be necessary for the purposes of the case, but he

may recess court on Friday or Saturday of such week to such time on the succeeding Sunday or Monday as, in his discretion, he deems wise. . . . Whenever a trial judge continues a session pursuant to this section, he shall cause an order to such effect to be entered in the minutes[.]

Defendant's argument is based on the absence of a formal written order memorializing the trial court's extension of the session, an issue that was addressed by this Court in *State v. Locklear*, 174 N.C. App. 547, 621 S.E.2d 254 (2005). In *Locklear*, a felony trial was not finished on Friday and the court extended the trial to the following Monday. The Defendant argued on appeal that, because the record did not contain a written order extending the session of court, the judgment entered against him was "null and void and must be vacated." This Court held:

[t]he record does not contain a written order specifically referencing N.C. Gen. Stat. § 15-167 and stating that the session was extended thereunder. However, there are sufficient statements made by the trial court in the record to comply with N.C. Gen. Stat. § 15-167 and to effectively extend the court session. The trial court had several discussions with counsel and the jury in open court, in which the trial court clearly referenced the extension of the session. . . . While it would have been the better practice for the trial court to expressly set forth in the minutes a formal order extending the court session, we hold that the trial court, in making repeated announcements in open court without objection from defendant, satisfied N.C. Gen. Stat. § 15-167.

*Id.* at 550, 551, 621 S.E.2d at 256, 257.

In the present case, as in *Locklear*, the trial court repeatedly announced that it was recessing court, with no objection by Defendant. We find *Locklear* controlling on this issue and hold that the court sufficiently complied with N.C. Gen. Stat. § 15-167. This assignment of error is overruled.

**[3]** Next, Defendant argues that the trial court "permitted the clerk to improperly poll the jurors" after the verdicts were returned, entitling him to a new trial. We disagree.

N.C. Gen. Stat. § 15A-1238 (2007) provides in part that:

Upon the motion of any party made after a verdict has been returned and before the jury has dispersed, the jury must be

polled. . . . The poll may be conducted by the judge or by the clerk by asking each juror individually whether the verdict announced is his verdict.

In the present case, the jury returned verdicts finding Defendant guilty of firing into an occupied vehicle and first-degree murder under the felony murder theory. After the verdicts were returned, the Clerk polled the jury individually, asking each one essentially the same question:

[Juror's name], Your foreperson has returned with the following verdict, that you found Mr. Hunt not guilty of conspiracy to commit first-degree murder, guilty of discharging a firearm into an occupied and operating vehicle, and guilty of first-degree murder under the first-degree felony murder rule. Is this your verdict, and do you still assent thereto?

All twelve jurors answered in the affirmative. Defendant made no objection to this procedure, but on appeal he argues that the trial court committed reversible error by failing to require the clerk to question the jurors separately about each of the two offenses.

However, prior appellate opinions indicate that the trial court is not required to question the jurors separately as to each offense of which a defendant is convicted. For example, in *State v. Ramseur*, 338 N.C. 502, 450 S.E.2d 467 (1994), the defendant was found guilty of first-degree murder, two counts of assault with a deadly weapon with intent to kill inflicting serious injury, and possession of a firearm by a felon. As in the case at bar, the clerk polled the jurors individually, listing the offenses of which the defendant had been convicted, and asking if that was the juror's verdict and if the juror still assented thereto. The defendant made no objection to this procedure, but argued on appeal that the poll was conducted in an improper manner. The Supreme Court of North Carolina held that "each of the jurors individually was told the charges for which the jury had returned a guilty verdict and was asked whether this was their verdict and whether they still assented to the verdict. We find no error in the manner in which the jury was polled." *Id.* at 507, 450 S.E.2d at 470.

Similarly, in *State v. Sutton*, 53 N.C. App. 281, 280 S.E.2d 751 (1981), the defendant was convicted of five counts of embezzlement and argued on appeal that the jury poll should have asked the jurors about each charge separately. This Court held:

> [T]he Clerk stated separately to each juror that [the] juror had returned a verdict of guilty as to Issue No. 1, guilty as to Issue No. 2, guilty as to Issue No. 3, guilty as to Issue No. 4, and guilty as to Issue No. 5. He then asked that juror whether that was his verdict, to which the juror assented, and whether he still assented thereto, to which the juror replied in the affirmative. . . . We hold that this procedure was substantially in accord with the requirements of G.S. 15A-1238 and note in passing that defendant made no request at trial that the Clerk be instructed to be more specific in the questions propounded to the jurors.

*Id.* at 289-90, 280 S.E.2d at 756. Defendant has not cited any cases requiring that jurors be polled separately as to each offense, and we find none. On the basis of *Ramseur*, *Sutton*, and similar cases, we hold that the jury was properly polled. This assignment of error is overruled.

---

**[4]** During jury *voir dire*, a prospective juror commented that there was too much "gunplay" in Durham. Defendant asserts that the trial court's failure to strike the entire jury pool in response to this remark constitutes reversible error. We disagree.

Firearms clearly were a part of this trial. Defendant shot Lutz with a semi-automatic rifle; Lutz had a smaller gun in his possession at the time. Witnesses also owned or used firearms. Accordingly, the subject of firearms generally, gun ownership, and gun violence was thoroughly explored during *voir dire*, both by the prosecutor and defense counsel. The trial court asked generally if any of the jurors had personal experiences that might make it difficult for them to serve on the jury; the prosecutor asked if any jurors had known someone charged with murder or serious assault; defense counsel sought the jurors' views on gun ownership. The resulting colloquies included juror disclosures about their previous experiences involving firearms or homicide. One juror was excused after informing the court that he "had a son killed last year and I don't think I can listen to all this." Another "knew a guy who killed somebody" and also had an uncle who had been charged with a violent crime. Two jurors had family members who had been convicted of murders committed with a firearm. A Durham business had been robbed, and its owner thought guns were involved. Another juror was excused after disclosing that her uncle was murdered in Durham the year before, and that the case was still pending. We also note that defense counsel told the jurors at the outset that Defendant had shot and killed the victim and that the issue would be whether he had acted in self-defense.

It is apparent that jury *voir dire* included a significant focus on the jurors' personal histories and opinions regarding firearms and gun violence. The challenged dialog occurred in this context and consisted of the following:

THE COURT: . . . Mr. Moore.

JUROR: Yes, sir. My little cousin was injured in a drive-by shooting on Cornwallis when he was five years old. He's now unable to use his legs.

THE COURT: Do you think, given what you've heard about this case, that you would not be able to be fair and impartial in a matter involving a shooting?

JUROR: Yes, sir. Because I think the gun play in Durham is just too much right now.

THE COURT: Thank you Mr. Moore. . . .

Mr. Moore was excused for cause and defense counsel later put on the record that he had asked the trial court to strike the jury panel and that the motion was denied. Defendant argues that the trial court's refusal to strike the entire jury panel "deprived [him] of a fair and impartial jury to consider his fate."

In support of this position, Defendant cites *State v. Gregory*, 342 N.C. 580, 467 S.E.2d 28 (1996). In *Gregory*, a prospective juror stated during *voir dire* that she had worked for the defendant's former attorney and had therefore learned confidential information that was favorable to the State. The juror was excused for cause and the remaining jurors were instructed to disregard her remarks. However, on appeal, the Court found plain error.

[E]ight of the jurors who determined defendant's guilt and ultimately recommended the death sentence heard [the juror] say, "I helped prepare the defense for [Defendant]; answer "Yes" when the court asked if she had learned confidential information which would be favorable to the State if learned by the State; and say about that confidential information, "I feel it may influence my decision." . . . [T]his information left the eight jurors who heard the conversation free to speculate about the nature of the damning information that defendant and his attorneys were presumably hiding from their view. If the jury saw any gaps in the evidence, the colloquy with [the juror] invited them to fill in the gaps

on the assumption that the missing information was favorable to the State.

*Id.* at 587, 467 S.E.2d at 33.

Defendant argues that the present case is similar to *Gregory*. We disagree. The prospective juror in *Gregory* announced in front of other jurors that she knew about confidential evidence against the defendant that would not be shared with the other jurors. Her statements pertained to the defendant then on trial, and suggested the existence of undisclosed evidence that was so significant that the juror could not disregard it. The resultant prejudice to the defendant is clear. Moreover, the implication that the jury would not be privy to important evidence invoked the specter of justice thwarted by "technicalities." In contrast, Mr. Moore gave no indication that he had information about Defendant, the witnesses, or the facts of this case. Defendant argues that he is entitled to a new trial on the basis of Mr. Moore's unremarkable comment expressing dismay at the amount of "gun play" in Durham. Defendant fails to articulate why such a generalized observation about gun violence was so damaging that a new trial is required.

The trial court "has broad discretion 'to see that a competent, fair and impartial jury is impaneled and rulings in this regard will not be reversed absent a showing of abuse of discretion.' " *State v. Black*, 328 N.C. 191, 196, 400 S.E.2d 398, 401 (1991) (quoting *State v. Johnson*, 298 N.C. 355, 362, 259 S.E.2d 752, 757 (1979)). We conclude that the trial court did not abuse its discretion by failing to strike the jury panel following Mr. Moore's comment. This assignment of error is overruled.

---

[5] Defendant's final argument is that the "short form indictment" used to charge him with first-degree murder was "fatally defective" and did not confer jurisdiction on the trial court. Defendant's argument has been rejected by the Supreme Court of North Carolina. *See State v. Braxton*, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000) ("this Court has consistently held that indictments for murder based on the short-form indictment statute are in compliance with both the North Carolina and United States Constitutions."). "This Court is bound by precedent of the North Carolina Supreme Court." *State v. Gillis*, 158 N.C. App. 48, 53, 580 S.E.2d 32, 36 (2003) (citation omitted). This assignment of error is overruled.

For the reasons discussed above, we conclude that Defendant had a fair trial, free of reversible error.

No error.

Judges McGEE and HUNTER, Robert C. concur.