STATE v. MARTIN

[131 N.C. App. 38 (1998)]

═══════════

STATE OF NORTH CAROLINA v. KEVIN BRADLEY MARTIN

No. COA97-59

(Filed 6 October 1998)

1. **Criminal Law— felony murder—self defense—evidence insufficient**

The trial court did not err in a prosecution for felony murder by denying defendant's request for an instruction on self-defense as to the underlying felonies, assault and discharging a firearm into occupied property. In felony murder cases, self-defense is

STATE v. MARTIN

[131 N.C. App. 38 (1998)]

available only to the extent that perfect self-defense applies to the relevant underlying felonies and the evidence here failed to support several elements of perfect self-defense.

## 2. Firearms and Other Weapons— discharging a firearm into occupied property—automobile—occupancy

The trial court did not err in a felony murder prosecution by denying defendant's motion to dismiss the underlying felony of discharging a firearm into occupied property where, viewing the evidence in the light most favorable to the State, there was substantial evidence to satisfy the element of occupancy. One victim testified that he heard gunshots when he was about halfway out of the car and that he was struck while his foot was still in the car, and other witnesses testified that the other victim remained in the vehicle after the shooting, viewed bullet holes in the automobile, and related that the second victim fell out of the car when the passenger door was opened.

Appeal by defendant from judgment entered 7 February 1996 by Judge Dexter Brooks in Cumberland County Superior Court. Heard in the Court of Appeals 22 October 1997.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Thomas F. Moffitt, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Benjamin Sendor, for defendant-appellant.*

JOHN, Judge.

Defendant appeals convictions of first-degree murder under the felony murder rule and assault with a deadly weapon with intent to kill inflicting serious injury. On appeal, defendant contends the trial court erred by denying his request to instruct the jury on self-defense and by denying his motion to dismiss. We conclude the trial court did not err.

The State's evidence at trial tended to show the following: On the morning of 22 June 1993, defendant and Sean Burney (Burney) argued on the telephone regarding Burney's demand for payment of $150.00 to $200.00, representing estimated damage to Burney's truck several years earlier when he and defendant were throwing rocks at a passing train. A rock thrown by defendant had ricocheted off the train and dented the door of Burney's truck. Claiming the damage was acciden-

tal, defendant refused to pay. The 22 June 1993 conversation concluded with an agreement to meet "at the park in Eaglewood" to settle the dispute by fighting. Burney testified defendant said, "[y]ou better bring all your damn boys."

After the conversation with defendant, Burney and Brian Bell (Bell) left to pick up Randy Dalton (Dalton). Burney, Bell and Dalton drove to the home of Billy Strickland (Strickland), where they met Strickland, Pat O'Quinn (O'Quinn), and another friend. Strickland testified the group planned to go swimming and had no intentions of fighting defendant that day.

O'Quinn related that Burney and Dalton left Strickland's residence to go to the store between 11:30 a.m. and 12:00 p.m., and that they were gone approximately ten to fifteen minutes. In the meantime, two vehicles pulled onto the shoulder of the road in front of Strickland's house. One was a pickup truck driven by Sean Terry (Terry), with defendant and Tony Lugo (Lugo) as passengers in the truck bed. The other was an automobile operated by Jim Johnson (Johnson).

Johnson and Terry parked their vehicles at the road and approached O'Quinn and Bell who were standing on the porch of Strickland's home. Terry inquired about the problems between Burney and defendant, and O'Quinn warned that defendant should leave before Burney returned. About that time, Burney and Dalton returned, and Burney drove his vehicle into the driveway. Neither Burney nor Dalton was armed.

As Burney described it, he was stepping out of the automobile when he noticed it start to roll backward. Burney placed his right foot on the brake and reached back inside the vehicle so as to set the emergency brake. When he was "about halfway out of the car," he heard gunshots. While his "right foot was still in the car," he felt the impact of a bullet fired by defendant which knocked him to the ground. Burney. was struck in the left side of his neck and the bullet exited his back below the shoulder blade. The automobile began to roll over Burney's feet, but he avoided it and ran into the house. As he fled, Burney observed defendant walking around with a rifle in his hand saying repeatedly, "What's up now?" Burney testified these constituted "fighting words."

Bell and O'Quinn both testified they observed defendant standing in the bed of the pickup truck shooting a .22 caliber rifle at Burney

and Dalton. O'Quinn stated he saw Dalton "slouch down into the V of the [open passenger side] door" and Burney "fall flat down on the concrete." O'Quinn testified that he heard several more shots, saw the windows on Burney's vehicle shatter, and then entered the house to place a 911 emergency call.

Terry, Johnson and Lugo attempted to assist Dalton after the shooting stopped. Dalton was sitting in the front passenger's seat of Burney's vehicle, his legs inside and his head resting on dashboard. Dalton had been shot in the upper left abdomen, and later died as the result of blood loss from a severed mesenteric artery. Burney recovered from his neck wound after hospitalization.

Law enforcement officers later located six spent shell casings outside the truck Terry had driven to Strickland's residence, and an additional casing in the truck bed. No firearms were discovered in or near Burney's automobile.

Hope Mills Police Chief John Hodges (Chief Hodges) was on duty the afternoon of the shooting. After hearing a radio alert, he stopped and questioned defendant near the crime scene. After defendant gave Chief Hodges a false name, Johnson identified defendant, and defendant was then transported to the police station. While there, defendant told Captain Tonzie K. Collins (Collins) the murder weapon was hidden behind a shed near the crime scene. Defendant led Chief Hodges and Collins to the site and a .22 caliber rifle was recovered. State Bureau of Investigation ballistics expert A.L. Langley testified all seven spent shell casings found at the scene of the shooting were fired from the retrieved rifle. Upon being returned to the station, defendant was left alone to prepare a written statement and he escaped. He was recaptured later that night with two friends approximately one mile from the South Carolina border.

Defendant testified on his own behalf as follows: On the morning of 22 June 1993, Burney telephoned defendant regarding the repair money, threatening to "take it out of [defendant's] ass" if it was not forthcoming. Burney vowed that "if he got his hands on me, he would kill me," which defendant understood to mean either kill or seriously injure defendant. Burney cursed repeatedly and threatened violence toward defendant's family during the conversation. Burney finally told defendant to meet him to fight it out, and said, "bring all your boys and all your weapons because we'll have ours." Defendant believed Burney because Burney had a reputation for violence and for carrying weapons.

Curtis Moody (Moody) overheard the foregoing conversation and began telephoning other friends to assist defendant in fighting Burney. Defendant's friend, Sean Marks, and Moody's friends, Terry, Lugo and Johnson arrived in response to Moody's calls and Terry brought a rifle.

Anticipating a fight with Burney, defendant and his five companions drove to Eaglewood Park. As they neared their destination, Terry handed a rifle through the window to the truck bed where defendant and Lugo were riding. Defendant explained that he was prepared to fight because he feared Burney or his friends might have a gun. Defendant observed Lugo take the weapon and wrap a bandana around it to catch ejected spent shell casings when the rifle was fired, and as Lugo explained, "to catch the shells from—falling around and, uh, possibly getting in trouble." However, defendant had no intention of either Lugo or himself firing the first shot.

When the group realized Burney was not at the park, defendant directed Terry, the vehicle driver, to take him home. However, Terry decided to stop at Strickland's house, notwithstanding defendant's protestation that it was not a good idea and his reiterated request to be taken home. Terry exited the truck and approached Burney's friends to talk things through and calm the situation.

At that point, Burney pulled into the driveway, "driving mighty fast." Dalton and Burney "jumped out of the car," Burney yelling to defendant, "[d]on't go nowhere[,] I have something for you." Burney's friends who had been standing on the porch, began approaching defendant. Lugo handed the rifle to defendant and he fired a warning shot into the air. When Burney reached back into his automobile after the car began to roll, he again turned toward defendant and said "something to the effect that, uh, 'He's armed, Randy. Get the gun.'" According to defendant, Dalton then

> turned to the passenger's side of the car, which the door was still open, kneeled down, reached under the seat of the car and came out with something in his hand. I'm not clear on what it was. He began to turn toward me, uh, with that object in his hand. At that point, I was, uh, very fearful for my life, and I started shooting in the direction of the car, never actually aiming the gun at Mr. Dalton.

After firing a total of seven shots, defendant realized he had injured Dalton. He "then got scared, jumped out of the truck and ran,"

dropping the rifle behind a shed. Approximately one and one-half hours later, Chief Hodges stopped defendant, who assumed a false name because he "was scared of being charged with something as serious as what had just took place." Defendant indicated during his testimony that he would not have shot at Dalton and Burney had he not feared for his own safety, and that he never intended to kill Dalton.

Defendant's friends, Moody and Terry, corroborated defendant's version of events. When asked about Burney's reputation for violence, Terry recounted incidents of Burney and a friend assaulting Terry, pointing guns at him and threatening to cut him. According to Terry, Burney exited his vehicle after entering Strickland's driveway, directed defendant not to go anywhere, and approached defendant looking "like he was wanting to hit [him]."

Lindsay Cobb, Heather McBride Cashwell and Amber Smith Stout (Stout), also called as witnesses for defendant, testified Burney had a reputation for starting fights and for violence. Stout further stated, "He gets into a lot of trouble. I've heard that he carries a gun, and sometimes a knife." On rebuttal, she testified Burney was "known to shoot up a couple houses."

Deputy Sheriff Ritchie J. Alfano of the Cumberland County Sheriff's Department testified Burney had a reputation as a trouble-maker who "was known to be in quite a few fights." He described Burney as having a reputation for picking fights when his friends were around in order to impress them.

During his testimony, Burney denied having a reputation for violence, but admitted having pleaded guilty to assault with a deadly weapon involving a knife, and to breaking or entering and larceny.

Following the jury's guilty verdicts, defendant was sentenced to life imprisonment for first-degree murder, plus twenty years for assault with a deadly weapon with intent to kill inflicting serious injury. Defendant entered timely notice of appeal.

[1] The essential issue on appeal is whether the trial court erred by denying defendant's request to instruct the jury on self-defense as to the felonies underlying his felony murder conviction, *i.e.,* assault with a deadly weapon and discharging a firearm into occupied property. We hold the court's refusal to do so was not error under the circumstances *sub judice*.

The trial court has broad discretion in presenting the issues to the jury, *State v. Flippin*, 280 N.C. 682, 687, 186 S.E.2d 917, 920 (1972). However, in determining whether to submit an instruction on self-defense, the court must consider the evidence in the light most favorable to the defendant. *State v. Blackmon*, 38 N.C. App. 620, 621-22, 248 S.E.2d 456, 457 (1978), *disc. review denied*, 296 N.C. 412, 251 S.E.2d 471 (1979).

Our Supreme Court has set forth the law of self-defense as follows:

> The right to act in self-defense rests upon necessity, real or apparent, and a person may use such force as is necessary or apparently necessary to save himself from death or great bodily harm in the lawful exercise of his right of self-defense. A person may exercise such force if he believes it to be necessary and has reasonable grounds for such belief. The reasonableness of his belief is to be determined by the jury from the facts and circumstances as they appeared to the accused at the time . . . . However, the right of self-defense is only available to a person who is without fault, and if a person voluntarily, that is aggressively and willingly, enters into a fight, he cannot invoke the doctrine of self-defense unless he first abandons the fight, withdraws from it and gives notice to his adversary that he has done so.

*State v. Marsh*, 293 N.C. 353, 354, 237 S.E.2d 745, 747 (1977) (citations omitted).

North Carolina law recognizes both "perfect" and "imperfect" self-defense. *See, e.g., State v. Wilson*, 304 N.C. 689, 694-95, 285 S.E.2d 804, 807 (1982). Perfect self-defense excuses a murder charge completely, and is established by showing that, at the time of the killing:

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

> (3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572-73 (1981).

Imperfect self-defense arises when the defendant reasonably believed it was necessary to kill the deceased in order to save himself from death or great bodily harm, but defendant, although without murderous intent, was the aggressor or used excessive force. *Wilson*, 304 N.C. at 695, 285 S.E.2d at 808. One who exercised the right of imperfect self-defense in killing an adversary remains "guilty of at least voluntary manslaughter." *Id.*

As defendant correctly recognizes, neither perfect nor imperfect self-defense is available to defend against first-degree murder under the felony murder theory. *State v. Richardson*, 341 N.C. 658, 668, 462 S.E.2d 492, 499 (1995). In felony murder cases, self-defense is available only to the extent that *perfect* self-defense applies to the relevant underlying felonies. *Id.* Imperfect self-defense is not available as a defense to felonies underlying a felony murder charge. *See id.* at 668-69, 462 S.E.2d at 499. We therefore consider whether defendant was entitled to an instruction on perfect self-defense as to the felonies underlying the felony murder charge.

The evidence is undisputed that defendant and his companions drove to Eaglewood park in search of Burney, prepared to fight and in possession of a rifle. The group thereafter continued to Strickland's residence where the fatal shooting occurred. Defendant argues he "sought to avoid [the] confrontation by twice telling Sean Terry not to stop at [Strickland's] house and to take [him] home." Viewing this latter evidence in the light most favorable to defendant, it is nonetheless ineffective to constitute a showing of withdrawal because it transpired prior to the actual confrontation with Burney and Dalton, and was not communicated to defendant's adversaries. *See Marsh*, 293 N.C. at 354, 237 S.E.2d at 747.

Soon after defendant and his friends arrived at Strickland's house, Burney and Dalton drove into the driveway, not completely blocking the vehicle in which defendant was located. According to defendant, he fired "a warning shot" as Burney and Dalton exited their automobile and began to approach defendant. Neither Burney nor Dalton were in possession of a weapon, deadly or otherwise.

Burney reached back into his automobile, again turned to defendant and said, "something to the effect that, 'uh, He's armed, Randy. Get the gun.' " Defendant stated Dalton then reached under "the seat of the car and came out with something in his hand," but that he was "not clear on what it was." Although defendant could not identify the object in Dalton's hand, he testified "[a]t that point, I was, uh, very fearful for my life, and I started shooting in the direction of the car," firing a total of seven shots. Pointedly, however, defendant insisted he was "never actually aiming the gun at Mr. Dalton," and that he never "at any time that day intend[ed] to kill Mr. Dalton."

Even viewing the foregoing in the light most favorable to defendant, we determine the trial court did not err by denying his motion for a jury instruction on self-defense. Defendant voluntarily, "aggressively and willingly," *Norris*, 303 N.C. at 530, 279 S.E.2d at 572-73, sought out a confrontation when he and his friends drove to the park and to Strickland's house looking for Burney. When Burney drove into Strickland's driveway, defendant neither communicated any desire to avoid confrontation nor attempted to leave the scene. The right of self-defense is available only to one who is "without fault," *Marsh*, 293 N.C. at 354, 237 S.E.2d at 747, and one who voluntarily enters into a fight "cannot invoke the doctrine of self-defense unless he first abandons the fight," *id.*, and notifies his adversary of his withdrawal, *id.* To the contrary, defendant brandished a rifle and fired it into the air. After hearing Burney say to Dalton "something to the effect that, uh, 'He's armed, Randy. Get the gun,' " defendant continued steadfast in the affray, firing six additional shots towards Burney's vehicle, *see Norris*, 303 N.C. at 530, 279 S.E.2d at 572-73 (defendant must not have used "excessive force"), killing Dalton and wounding Burney.

Finally, in order for defendant to have been entitled to an instruction on self-defense, it must have "appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm." *Id.* Taking defendant's own testimony in the light most favorable to him, he fired the rifle several times in the direction of Burney's vehicle, never aiming the weapon at Dalton or intending to kill him. This testimony belies defendant's insistence that he was entitled to a self-defense instruction. *See State v. Daniels*, 87 N.C. App. 287, 289-90, 360 S.E.2d 470, 471 (1987) ("defendant's own testimony tends to show she did not believe it was necessary to kill [decedent], since she did not intend to either stab or hurt him"). Because the evidence fails to support several elements of perfect self-defense, *see Norris*, 303 N.C. at 530, 279 S.E.2d at 572-73,

STATE v. MARTIN

[131 N.C. App. 38 (1998)]

the trial court's failure to deliver the requested instruction thereon was not erroneous.

[2] Defendant also contends the trial court erred by denying his "motion to dismiss the underlying felony for felony murder of discharging a firearm into occupied property." Faced with a criminal defendant's motion to dismiss, the trial court must "consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference." *State v. McAvoy*, 331 N.C. 583, 589, 417 S.E.2d 489, 493 (1992). The trial court must deny the motion if it determines there is substantial evidence to support each element of the offense charged and that defendant was the perpetrator. *Id.*

Focusing on the requirement of N.C.G.S. § 14-34.1 (1997) that the proscribed offense constitutes discharging a firearm into a vehicle "while it is occupied," defendant maintains the State failed to satisfy its burden of presenting evidence that Burney's vehicle was occupied at the time of the shooting. We do not agree.

Burney testified he heard gunshots when he was "about halfway out of the car," and that he was struck by a bullet while his "right foot was still in the car." Terry, the pickup truck driver, stated that after the shooting, he and others approached Burney's automobile to check on Dalton. Dalton remained seated in the passenger seat of the vehicle, with his "head . . . up at the dashboard" and his feet and legs still inside. Further, Terry viewed bullet holes in Burney's automobile, and related that when he and others opened the passenger side door, Dalton "fell out of the car." O'Quinn testified he observed defendant shooting at Burney and Dalton, and saw Dalton "slouch down into the V of the [open passenger side] door" of Burney's vehicle.

Viewing the evidence in the light most favorable to the State, we hold there was substantial evidence to satisfy the element of "occupancy" under G.S. § 14-34.1, and that the trial court did not err in denying defendant's motion to dismiss.

No error.

Judges GREENE and TIMMONS-GOODSON concur.