IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-425

Filed: 31 December 2020

Stanly County, No. 17CRS52099

STATE OF NORTH CAROLINA

v.

CHARLES STEPHENS, Defendant.

Appeal by Defendant from judgments entered 19 September 2018 by Judge Jeffery K. Carpenter in Stanly County, Superior Court. Heard in the Court of Appeals 3 March 2020.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Teresa M. Postell, for the State.*

> *Goodman Carr, PLLC, by W. Rob Heroy and Dan Roberts, for Defendant-Appellant.*

McGEE, Chief Judge.

Charles Stephens ("Defendant") appeals from judgments entered 19 September 2018 finding him guilty of assault with a deadly weapon inflicting serious injury and discharging a weapon into an occupied dwelling. Defendant contends the trial court erred by (1) denying his jury instruction on self-defense, (2) limiting his cross-examination about a witness's prior felony conviction, and (3) denying him the opportunity to present evidence about an after-the-fact encounter.

I. Factual and Procedural History

Joel Drye ("Mr. Drye") and Defendant lived in Albemarle, North Carolina, about a mile apart in an area locally known as Palestine in 2017. As Mr. Drye slept in his bedroom on the morning of 29 September 2017, Debra Drye ("Ms. Drye"), Mr. Drye's wife, allowed one of the family's dogs outside to relieve itself and started doing laundry. However, after Ms. Drye opened the door to allow the first dog to go out, the door did not close all the way. Before Ms. Drye realized the back door was not closed, the family's other dog escaped.

A little after 10:30 a.m., Defendant knocked on the Dryes' back door. When Ms. Drye answered the door, Defendant, a man Ms. Drye had seen before but did not know, said "[y]our dogs killed my cat[,] [m]y wife called me and told me your dogs killed my cat." Ms. Drye attempted to apologize, but Defendant demanded to speak with Mr. Drye. Ms. Drye went to the bedroom and awakened Mr. Drye, telling him, "[t]he dogs got out this morning and there's a man out here and he said our dogs killed his cat."

Mr. Drye got out of bed and met Defendant at the back door to talk. Mr. Drye testified Defendant was standing "just beyond [his] back steps." Mr. Drye said he stepped down to the bottom step and Defendant said "your g..d… dogs killed my cat" and "[w]hy aren't you out getting your dogs. They've killed some more of my pets."

This was not the first time the Dryes' dogs had gotten loose and killed a neighbor's pet. Mr. Drye, like Ms. Drye, acknowledged and apologized for Defendant's loss of his cat. Mr. Drye told Defendant, "I'm sorry. We will do what we need to

do . . . [about] the cat." Mr. Drye offered to "pay any damages," but that only made Defendant angrier. Defendant testified at trial that "we're just back and forth about the dogs, why aren't you getting them? That is my big thing. And, you know, people's children, there's people's children in the neighborhood."

In frustration, Defendant called Mr. Drye a "g..d… son of a b….." Mr. Drye told Defendant that he does not allow the use of vulgarities in his house and asked Defendant to stop "using God's name in vain." Defendant asked Mr. Drye, "[w]hat you going to do about it, you g..d… son b….."

As the argument escalated, Mr. Drye grabbed a piece of lumber, a photo of which was introduced into evidence, and which was described as a "2-inch by 2-inch stick." Defendant drew his 9mm Smith & Wesson pistol, for which he has a concealed-carry permit. At this point, Defendant's and Mr. Drye's stories diverge.

Defendant claims he drew his weapon after Mr. Drye beat him with the piece of lumber. Even then, Defendant claims he never aimed the weapon at Mr. Drye, but instead, laid the pistol across his stomach as a warning. Defendant testified as follows:

> [Mr. Drye] hit me in the arm and across the shoulder with the stick, because when I was turning, he hit me on this side. And you can tell by the wound, it's a square object that hit me. And then the bruise on my shoulder. And that's when I pulled [the pistol] out and put it on my stomach because he had already -- I was walking away from him after our discussion was over, and that's when he throwed the stick down and run in the house. And his wife was right on his heels[.]

Defendant contends that Mr. Drye emerged from the house with a .45 caliber firearm and began shooting at him. Defendant testified that Mr. Drye "grazed me with a round[,]" and offered photographic evidence of his torn shirt and scratch on his side. Defendant testified that he returned fire, shooting Mr. Drye in self-defense.

The State contends Mr. Drye never raised the piece of lumber to beat Defendant. Instead, the State argued at trial that Defendant drew his weapon as soon as Mr. Drye grabbed the stick, pointed the gun in Mr. Drye's face, and threatened Defendant as "pick up that stick, I'll kill you g..d... a..." The State contends that only after Defendant's initial threat did Mr. Drye run into his house to grab his pistol and a magazine. Ms. Drye testified that she was "hollering" "[n]o, no, no, no, no, [Mr. Drye], no, no," "because [she] was hoping that [Mr. Drye] didn't come back out [of the house with his gun]," "because [she] wanted him to stay safe in the house."

Defendant allegedly waited in the driveway for Mr. Drye to return, while pointing his gun at the front and back door, "[m]oving the gun back and forth." The State concedes that Mr. Drye was the first to shoot when he returned from his house with a gun. Ms. Drye testified that Mr. Drye "fired up in the air and he said, 'Go in the house, Debbie. Go call the law.'" Ms. Drye went inside the house to call 911.

In total, Mr. Drye fired at least ten bullets at Defendant, and Defendant fired seven bullets at Mr. Drye, one of which struck Mr. Drye in the leg. Mr. Drye testified

4

that he was shot from behind while fleeing. Ms. Drye called 911 a second time to report her husband's injury. Defendant got in his car and drove home where he, too, called 911.

The Stanly County Sheriff's Office responded to both 911 calls and issued a warrant for Defendant's arrest on 2 October 2017. Defendant was indicted on one count of assault with a deadly weapon inflicting serious injury and discharging a weapon into an occupied dwelling on 13 November 2017. Almost a year later, a jury convicted Defendant of both offenses and the trial court sentenced Defendant to two presumptive consecutive sentences of 20 to 33 months on 19 September 2018. Defendant's sentences were suspended with supervised probation for 36 months and special conditions that Defendant serve 30 days in jail, have no contact with the Dryes, and pay restitution. Defendant appeals.

## II. Analysis

Defendant raises three questions on appeal: (1) whether the trial court erred in failing to instruct the jury on self-defense based on an incorrect application of North Carolina law; (2) whether the trial court erred in prohibiting him from cross-examining Mr. Drye about his felonious possession of a firearm where it was relevant to Mr. Drye's incentive to cooperate with the State; and (3) whether the trial court erred in denying Defendant the opportunity to present evidence of an after-the-fact encounter between Defendant and Mr. Drye, in which Mr. Drye acknowledged blame for the encounter.

At trial, Defendant argued for a jury instruction on self-defense, but the trial court denied Defendant's requested instruction. Defendant argues the trial court erred in denying the jury instruction because a factual dispute existed of whether he was the aggressor. Alternatively, he argues he was entitled to a jury instruction on self-defense because a factual dispute existed of whether he withdrew and regained the right to self-defense under N.C. Gen. Stat. §§ 14-51.4(a) and (b) (2019).

The trial court is required to instruct the jury on all substantial features of a case. *State v. Cook*, 254 N.C. App. 150, 152, 802 S.E.2d 575, 577 (2017), *aff'd*, 370 N.C. 506, 809 S.E.2d 566 (2018). "Any defense raised by the evidence is deemed a substantial feature of the case[.]" *State v. Hudgins*, 167 N.C. App. 705, 708, 606 S.E.2d 443, 446 (2005) (citation omitted). "For a particular defense to result in a required instruction, there must be substantial evidence of each element of the defense when viewing the evidence in a light most favorable to the defendant." *State v. Brown*, 182 N.C. App. 115, 118, 646 S.E.2d 775, 777 (2007) (citation omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *State v. Burrow*, 248 N.C. App. 663, 666, 789 S.E.2d 923, 926 (2016) (quoting *State v. Ferguson*, 140 N.C. App. 699, 706, 538 S.E.2d 217, 222 (2000)).

"When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to [the] defendant." *State v. Mash*, 323 N.C. 339,

348, 372 S.E.2d 532, 537 (1988) (citations omitted). "'Whether evidence is sufficient to warrant an instruction on self-defense is a question of law; therefore, the applicable standard of review is *de novo*.'" *State v. Edwards*, 239 N.C. App. 391, 393, 768 S.E.2d 619, 621 (2015) (citations omitted).

The law of self-defense is well-established in North Carolina:

> The right to act in self-defense rests upon necessity, real or apparent, and a person may use such force as is necessary or apparently necessary to save himself from death or great bodily harm in the lawful exercise of his right of self-defense. A person may exercise such force if he believes it to be necessary and has reasonable grounds for such belief. The reasonableness of his belief is to be determined by the jury from the facts and circumstances as they appeared to the accused at the time. . . . However, the right of self-defense is only available to a person who is without fault, and if a person voluntarily, that is aggressively and willingly, enters into a fight, he cannot invoke the doctrine of self-defense unless he first abandons the fight, withdraws from it and gives notice to his adversary that he has done so.

*State v. Martin*, 131 N.C. App. 38, 44, 506 S.E.2d 260, 264–65 (1998) (internal citations and quotation marks omitted).

"North Carolina law recognizes both 'perfect' and 'imperfect' self-defense." *Id.* at 44, 506 S.E.2d at 265 (citation omitted). Only perfect self-defense is available for charges of felony assault and discharging weapons into occupied property. *State v. Richardson*, 341 N.C. 658, 668–69, 462 S.E.2d 492, 499 (1995).

> Perfect self-defense requires the existence of all four of the following elements:

7

(1) It appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) Defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) Defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) Defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

Imperfect self-defense is available when elements (1) and (2) listed above are met, but either the defendant "was the aggressor or used excessive force."

*State v. Juarez*, 369 N.C. 351, 354, n.1, 794 S.E.2d 293, 297, n.1 (2016) (citations and brackets omitted). Defendant advances three arguments that he was entitled to an instruction on self-defense: (1) his "brandishing" of a handgun did not "provoke" lethal force, and he was therefore not the aggressor; (2) "Mr. Drye provoked the use of deadly force by attacking [Defendant] with a wooden club"; and (3) assuming Defendant was an aggressor, he nevertheless regained his right to use deadly force in self-defense under N.C.G.S. § 14-51.4(2)(b).

A. Whether Defendant Was the "Aggressor"

Defendant first argues he is entitled to a jury instruction on self-defense. In order to be entitled to the instruction on this ground, Defendant must show

substantial evidence of all four of the elements of perfect self-defense. *See id.* Taken in the light most favorable to Defendant, we hold substantial evidence tends to show Defendant could establish the elements for perfect self-defense and was therefore entitled to an instruction on self-defense. First, the evidence shows Defendant believed the use of deadly force against Mr. Drye was necessary, by returning fire with his firearm. Moreover, the jury could find this belief was reasonable. Third, the use of deadly force by returning fire is not excessive when it is used to meet deadly force. The ultimate issue, then, is whether Defendant was the aggressor—that is, whether Defendant "aggressively and willingly enter[ed] into the fight without legal excuse or provocation." *Id.*

Defendant argues he was not the aggressor because, when taken in the light most favorable to Defendant, substantial evidence tends to show, "while he was upset, he peacefully confronted [Mr.] Drye and urged him to collect his dogs before they killed any other animals or possibly a child"; "he had not threatened [Mr.] Drye, brandished a firearm, or had been ordered off the property when [Mr.] Drye struck him with the lumber"; and "[i]t was at that point, combined with telling [Mr.] Drye, 'don't hit me with it again,' that [Defendant] demonstrated he was armed." Defendant's evidence shows "[h]e did not point the weapon at [Mr.] Drye or state that he would use the weapon." Instead, Mr. Drye went inside, retrieved his handgun gun, and came out firing, at which point Defendant returned fire. The State, in turn, argues that Defendant was the aggressor because

9

> he not only approached [Mr. Drye] with a gun, he did so at the back door of [Mr. Drye]'s home; while seeking to vent his angry complaints, although he admittedly could not have obtained any response that would have pleased him at that point; he repeated his complaints multiple times and with increasing volume and vulgarity; and he removed the gun from where he had it concealed, to display it, purposely to create imminent fear of deadly consequences.

Taking the evidence in the light most favorable to Defendant, we must assume Defendant's version of events is correct and Defendant did not fire at Mr. Drye first, which the State conceded, and he only brandished his firearm after Mr. Drye struck him twice with the piece of lumber.

Defendant contends that brandishing the firearm was not "provocation" of serious or deadly force and that he was therefore entitled to a self-defense instruction. The State in turn argues, relying on *State v. Holloman*, 369 N.C. 615, 799 S.E.2d 824 (2017), that merely brandishing the firearm made Defendant the aggressor. *Holloman* is distinguishable, however, as the defendant entered onto the property of the victim with his gun drawn, "by his side," unlike in this case. *Id.* at 618, 799 S.E.2d at 827. More fundamentally, however, *Holloman* involved the question of whether, under the applicable statute, a person previously determined to be the aggressor nevertheless could regain the right to use force when "the person provoked responded by using such significant force that the aggressor was placed in imminent danger of death or serious bodily harm, the aggressor did not have a reasonable opportunity to retreat, and the aggressor c[ould] only protect himself or herself from death or serious

bodily harm by using defensive force." *Id.* at 624–25, 799 S.E.2d at 831. Our Supreme Court held the defendant could not. *Id.* at 629, 799 S.E.2d at 833. In *Holloman*, unlike here, the jury was able to consider whether the defendant was entitled to self-defense and whether he or the victim was the aggressor, thus he was not an aggressor as a matter of law. *See id.* at 629, 799 S.E.2d at 833–34.

Defendant cites to other cases supporting his contention that brandishing a weapon does not, as a matter of law, rise to the use of force. *See State v. Spaulding*, 298 N.C. 149, 155, 257 S.E.2d 391, 395 (1979) (defendant armed with knife was not aggressor so long as he did not use it until it became necessary for self-defense); *State v. Vaughn*, 227 N.C. App. 198, 203, 742 S.E.2d 276, 279 (2013) (decision to arm herself did not make defendant aggressor); *State v. Tann*, 57 N.C. App. 527, 531, 291 S.E.2d 824, 827 (1982) (defendant who armed himself in anticipation and failed to avoid fight was not aggressor). It is unnecessary to decide whether brandishing a weapon is sufficient as a matter of law to constitute "provocation" of use of deadly force, because, assuming "brandishing" a gun constitutes the use of serious or deadly force, when taken in the light most favorable to Defendant, there is a preceding question as to whether Mr. Drye, by brandishing and hitting Defendant with a two-inch by two-inch piece of lumber, provoked the use of deadly force by his own use of serious or deadly force.

"A dangerous or deadly weapon is 'any article, instrument or substance which is *likely* to produce death *or* great bodily injury.'" *State v. Young*, 317 N.C. 396, 417,

11

346 S.E.2d 626, 638 (1986) (citation omitted). "'Where the alleged deadly weapon and the manner of its use are of such character as to admit of but one conclusion, the question as to whether or not it is deadly . . . is one of law, and the Court must take the responsibility of so declaring.'" *Id.* at 416–17, 346 S.E.2d at 638 (citation omitted).

The State argues whether the piece of lumber used by Mr. Drye is a deadly weapon is a question for the Court, and not the jury, because "a single swing of the stick to [D]efendant's arm and shoulder resulting in a bruise supported only the conclusion it was not used in a manner likely to cause death or serious bodily injury, thus the trial court did not err." The State cites to the previous passage from *Young* and *State v. Smith*, 187 N.C. 469, 121 S.E. 737 (1924), in support of this proposition, but in our view, both cases demand the opposite conclusion.

In *Young*, our Supreme Court held the trial court did not err in giving an instruction that a pocket knife was a dangerous or deadly weapon when pocket knives have long been held to be a deadly weapon in North Carolina as a matter of law and the uncontroverted evidence was that the defendant apparently inflicted injury on the victim. *Young*, 317 N.C. at 417, 346 S.E.2d at 638. This case is distinguishable, however. For the deadly nature of a weapon to be a question of law for the Court and not a question of fact for the jury, both the "'alleged deadly weapon *and* the manner of its use'" must be "'of such character as to admit of but one conclusion[.]'" *Id.* at 416–17, 346 S.E.2d at 638 (citation omitted). Here, although the State argues the manner of Mr. Drye's use of the two-inch by two-inch piece of lumber in striking

Defendant was not serious or deadly, we cannot conclude as a matter of law that the

"'alleged deadly weapon . . . [is] of such character as to admit of but one conclusion[.]'"

*Id.* Moreover, the State here, like the defendant in *Young*, argues that the actual use

of the weapon did not produce serious bodily injury. But, as in *Young*, that argument

"misses the point. In order to be characterized as a 'dangerous or deadly weapon,' an

instrumentality need not have actually inflicted serious injury." *Id.* at 417, 346

S.E.2d at 638.

 *State v. Smith* also supports giving the question to the jury. In *Smith*, the

defendant killed the victim "by striking him on the head with a baseball bat[,]" and

the Supreme Court held that "a baseball bat should be similarly denominated [as a

deadly weapon], if viciously used, as under the circumstances of this case." *Smith*,

187 N.C. at 470, 121 S.E.2d at 737. In its ruling, the Supreme Court cited the

following rules:

> Where the alleged deadly weapon and the manner of its use
> are of such character as to admit of but one conclusion, the
> question as to whether or not it is deadly within the
> foregoing definition is one of law, and the Court must take
> the responsibility of so declaring. But where it may or may
> not be likely to produce fatal results, according to the
> manner of its use, or the part of the body at which the blow
> is aimed, its alleged deadly character is one of fact to be
> determined by the jury.

*Id.* (internal citations omitted).

 The piece of lumber Mr. Drye used here was not unlike the baseball bat our

Supreme Court held to be a deadly weapon as a matter of law in *Smith*. *See id.* The

13

State essentially asks us to instead hold it is *not* a deadly weapon as a matter of law. This we decline to do. Following the reasoning of *Smith*, we note a piece of lumber "may or may not be likely to produce fatal results, according to the manner of its use, or the part of the body at which the blow is aimed," thus "its alleged deadly character is one of fact to be determined by the jury." *Id.*

The trial court in this case did not submit the question of whether Defendant's displaying of a handgun was use of a "deadly weapon" to the jury. Instead, the trial court seems to have so concluded as a matter of law. In such circumstances, this Court has held the question of whether the use of such deadly force was justified is for the jury. *See State v. Whetstone*, 212 N.C. App. 551, 563, 711 S.E.2d 778, 787 (2011) (holding that, "in those cases where the weapon is not a deadly weapon *per se*, but the question of whether the weapon is a deadly weapon is not submitted to the jury because the trial judge concludes on the evidence of the case that the weapon used was a deadly weapon as a matter of law, the jury should be instructed that the assault would be excused as being in self-defense only if the circumstances at the time the defendant acted were such as would create in the mind of a person of ordinary firmness a reasonable belief that such action was necessary to protect himself from death or great bodily harm[]").

In this case, taking the evidence in the light most favorable to Defendant, the jury could have determined that Defendant was permitted to brandish his firearm because he had a reasonable belief it was necessary to protect himself from death or

great bodily harm and because Mr. Drye was the initial aggressor and provoked him through the use of serious or deadly force in striking him with a piece of lumber. The trial court's denial of Defendant's requested jury instruction on self-defense constituted reversible error.[1] *See State v. Marsh*, 293 N.C. 353, 355, 237 S.E.2d 745, 747 (1977) ("[T]here was competent evidence which would permit, but not require, the jury to find that defendant did not voluntarily and aggressively enter into an armed confrontation with [the victim], but used only such force as was necessary, or appeared to him to be necessary in order to save himself from death or great bodily harm. It is for the jury to decide whether or not defendant's belief was reasonable.").

B. Regaining the Right to Self-Defense

Assuming, *arguendo*, Defendant was the aggressor because he provoked the use of serious or deadly force by brandishing his handgun, we further hold the jury could nevertheless find Defendant regained the right to use force in self-defense under N.C.G.S. § 14-51.4(2)(b). N.C.G.S. § 14-51.4(2)(b) states that a person who is the initial aggressor regains the right of self-defense where:

> The person who used defensive force withdraws, in good faith, from physical contact with the person who was provoked, and indicates clearly that he or she desires to withdraw and terminate the use of force, but the person who was provoked continues or resumes the use of force.

N.C.G.S. § 14-51.4(2)(b).

---

[1] The State is also entitled to an "aggressor instruction." *See, e.g., State v. Mumma*, 372 N.C. 226, 240, 827 S.E.2d 288, 297 (2019).

Taken in the light most favorable to Defendant, the evidence shows Defendant retreated toward his vehicle from Mr. Drye's house. Specifically, Defendant testified that, when Mr. Drye went inside to retrieve his handgun, Defendant "started to make [his] way back to [his] vehicle," and it was only as he was leaving the driveway and passing Mr. Drye's "yellow truck" that Mr. Drye began firing on him, and striking Defendant. Taking these facts as true, Defendant withdrew by walking toward his vehicle, clearly announcing his intent to withdraw by actually leaving. It was Mr. Drye, who resumed the use of deadly force by firing on Defendant as he was walking toward his vehicle. *Holloman*, upon which the State relies, is distinguishable from these circumstances because, in that case, the defendant did not attempt to withdraw. *See Holloman*, 369 N.C. at 618, 799 S.E.2d at 827.

Taking the evidence in the light most favorable to Defendant, substantial evidence tended to show that, even if Defendant was the initial aggressor, he nevertheless regained his right to use force in self-defense under N.C.G.S. § 14-51.4(b) by leaving and walking toward his truck. Therefore, as an alternative basis, Defendant was entitled to a jury instruction on self-defense because the evidence supports a finding that he withdrew from the dispute.

## III.   Conclusion

We hold the trial court prejudicially erred in failing to give a jury instruction on self-defense because: (1) substantial evidence supported finding Defendant had perfect self-defense because a jury could find that Mr. Drye initially provoked the use

16

of force by using deadly force of his own; and (2) assuming, *arguendo*, Defendant was the initial aggressor, substantial evidence showed he regained his right to self-defense by withdrawing from the dispute under N.C.G.S. § 14-51.4(b).

Because we hold the trial court erred by denying the self-defense instruction, we do not address Defendant's arguments that the trial court erred in prohibiting Defendant's counsel from cross-examining Mr. Drye about his felonious possession of a firearm where it was relevant to Mr. Drye's incentive to cooperate with the State; and that the trial court erred in denying Defendant the opportunity to present evidence of an after-the-fact encounter between Defendant and Mr. Drye, in which Mr. Drye acknowledged blame for the encounter. We reverse the judgment of the trial court and remand for a new trial consistent with this decision.

NEW TRIAL.

Judge STROUD concurs.

Judge TYSON concurs in separate opinion.

TYSON, Judge, concurring.

I fully concur with the majority's opinion on the issues it reaches and resolves. Defendant raised additional issues on appeal: (1) the trial court's limiting Defendant's cross-examination about Drye's prior felony conviction and his possession of a firearm on the day of the events; (2) whether the trial court erred in preventing inquiry of some undisclosed transaction or agreement reached between Drye and the State in exchange for his testimony against Defendant; and, (3) whether the trial court erred denying Defendant the opportunity to present testimony concerning an after-the-fact encounter between Drye and Defendant, where the men purportedly reconciled. These unaddressed issues may arise again at any new trial.

## I. Standard of Review

Under Rules of Evidence 401-403, "[t]he admissibility of evidence is governed by a threshold inquiry into its relevance. In order to be relevant, the evidence must have a logical tendency to prove any fact that is of consequence in the case being litigated." *State v. Griffin*, 136 N.C. App. 531, 550, 525 S.E.2d 793, 806 (citation and quotation marks omitted).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401(2019). "All relevant evidence is admissible, except as otherwise provided[.]" N.C. Gen. Stat. § 8C-1, Rule 402 (2019).

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C. Gen. Stat. § 8C-1, Rule 403 (2019). If relevant evidence is excluded by the trial court as more prejudicial than probative, "[w]e review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion." *State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008) (citations omitted). "[A]s long as the procedure followed by the trial court demonstrates that a Rule 403 balancing test was conducted, a specific finding is not required." *State v. Harris*, 149 N.C. App. 398, 405, 562 S.E.2d 547, 551 (2002).

## II. Excluding Relevant Evidence

Regarding admission of evidence of prior criminal convictions, Rule 609 provides: "[E]vidence that the witness has been convicted of a felony . . . shall be admitted . . . during cross-examination." N.C. Gen. Stat. § 8C-1, Rule 609(a) (2019). "Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of the conviction." N.C. Gen. Stat § 8C-1, Rule 609(b). Defendant asserted Drye's prior conviction was relevant for impeachment purposes.

Pursuant to Rule 609, Defendant gave proper notice to the State of his intent to use Drye's prior 1979 felony to impeach him during trial and, but for the conviction having occurred more than 10 years prior, Defendant would have been entitled to use Drye's prior conviction to impeach him. N.C. Gen. Stat. § 8C-1, Rule 609(a)-(b).

The trial court applied the balancing test and found, "the danger of unfair prejudice and confusion of the issues or misleading the jury would substantially outweigh the probative value. Therefore, it would be inadmissible under Rule 403." Defendant has failed to show any abuse of discretion in the trial court excluding evidence of Drye's prior felonious assault conviction pursuant to Rule 609.

### III. Denied Cross-Examination

"A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C. Gen. Stat. § 8C-1, Rule 611(b) (2019). "[T]he main purpose of impeachment is to discount the credibility of a witness for the purpose of inducing the jury to give less weight to his testimony." *State v. Mendoza*, 206 N.C. App. 391, 397, 698 S.E.2d 170, 175 (2010) (citation and internal quotations omitted).

"[A]lthough cross-examination is a matter of right, the scope of cross-examination is subject to appropriate control in the sound discretion of the court." *State v. Larrimore*, 340 N.C. 119, 150, 456 S.E.2d 789, 805 (1995) (citations omitted); *see also* N.C. Gen. Stat. § 8C-1, Rule 611(a) (2019).

"In general, we review a trial court's limitation on cross-examination for abuse of discretion." *State v. Bowman*, 372 N.C. 439, 444, 831 S.E.2d 316, 319 (2019). "If the trial court errs in excluding witness testimony showing possible bias, thus violating the Confrontation Clause, the error is reviewed to determine whether it was harmless beyond a reasonable doubt." *Id*. at 444, 831 S.E.2d at 319.

Drye was previously convicted of felonious assault with a deadly weapon with intent to inflict serious injury in 1979. The record does not reflect whether Drye's citizenship rights to possess a firearm have been restored. Drye may have been subject to charges for possession of a firearm by felon and a potentially new assault with a deadly weapon with the intent to inflict serious injury of Defendant. Drye responded twice during *voir dire*, "I don't recall," to the question of whether there was a discussion with the district attorney of his potential criminal charges.

Defendant's counsel requested to "inquire of [Drye] not about his old conviction, which we understand is 30 years in the past, but that we be allowed to inquire as to his felon status and the fact that he was not legally allowed to own a gun or possess a gun in his residence."

In *State v. Murray*, 27 N.C. App 130, 133, 218 S.E.2d 188, 191 (1975), this Court held it was error when a trial court refused to allow a defendant to provide evidence of the witness's "motive and interest in testifying against the defendant." The Court found the error was particularly significant where "[t]he State's entire case depended solely upon [the witness's] testimony." *Id*

In the pretrial conference, Defendant argued he should be permitted to impeach Drye based upon *State v. Rankins*, 133 N.C. App. 607, 610, 515 S.E.2d 748, 750 (1999). In *Rankins*, this Court ordered a new trial in a case where the trial judge had excluded testimony regarding whether the State insinuated a threat of an

enhanced sentence to a witness. This Court also noted failure to make a specific offer of proof was not fatal to review of defendant's claim. *Id.*

The trial court provided a summary of its reasoning prior to its ruling under Rule 609, but did not analyze potential admissibility of Drye's underlying bad acts under Rule 404(b). N.C. Gen. Stat. § 8C-1, Rule 404(b) (2019). Upon remand, the trial court should examine and rule upon the admissibility of Drye's prior bad acts pursuant to Rule 404(b). This rule allows "[e]vidence of other crimes, wrongs, or acts . . . may . . . be admissible for . . . proof of motive, opportunity, intent . . . knowledge." N.C. Gen. Stat. § 8C-404(b).

Defendant clearly stated he sought to use Drye's underlying prior bad acts for impeachment purposes to show knowledge, preparation, absence of mistake, and plan. Counsel argued: "Mr. Drye was *aware* that he had a prior felony . . . through Mrs. Drye's testimony [] she saw her husband come through the house . . . *obtained* a weapon, and that he *knew* [he] was not able to have that weapon." (emphasis supplied). Counsel clearly stated, "[w]e're not offering it as character evidence. We're not offering it as propensity evidence. We're offering it as impeachment evidence."

Defendant's counsel also argued the jury should be aware "the prosecutor's office has failed to charge Mr. Drye with (sic) in this case." Counsel continued, "whether they spoke to him about it, whether it's been implied, whether it's been discussed, whether it's been promised . . . the thing that has been ruled can be

inquired to by the defense." Following a *voir dire* examination of Drye, the trial court forbade the defense from questioning Drye on the issue and admonished counsel not to object in front of the jury.

Drye's testimony and credibility were central issues in the State's case-in-chief. Drye's answers were arguably evasive during *voir dire* where: (1) Drye may have been dishonest about whether or not he knew he had previously been convicted of felony assault with a deadly weapon with intent to inflict serious injury; (2) Drye based his understanding that he could possess a firearm not on the judge's order or restored rights, but upon statements from his lawyer who convinced him to accept the plea bargain in 1979; and, (3) Drye's inability to recall whether or not the State had indicated to him that he could be prosecuted for his firearm possession or assault on Defendant. Prejudice from the exclusion to Defendant is apparent, as Drye was the primary complaining witness and the other individual involved in the shootout, who fired multiple shots at Defendant.

Upon remand, the trial court should determine whether Defendant should have the opportunity to cross-examine Drye about whether he had engaged in a prior assault with a deadly weapon with the intent to injure another, his illegal possession of a handgun, and his initial statements to law enforcement and whether or not the State had incentivized his testimony.

IV. <u>After-the-Fact Encounter</u>

Defendant also sought to present evidence of an after-the-fact encounter with Drye in which Drye had apologized and offered Defendant a hug after a relative's funeral. The testimony, if believed by the jury, was relevant to Defendant's and Drye's credibility.

Rule 404(b) is a "general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant subject, to but *one exception*[.]" *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Rule 404(b) has been applied to permit admission of evidence of other interactions between a defendant and victim, which are relevant to the "complete story" in *State v. Agee*, 326 N.C. 542, 547, 391 S.E.2d 171, 174 (1990).

In *Agee*, this Court held that other interaction between a victim and a defendant is relevant evidence "if it forms part of the history of the event or serves to enhance the natural development of the facts." 326 N.C. at 547, 391 S.E.2d at 174 (internal citations and quotations omitted). This Court described admission under the rule as a "complete story" or "chain of circumstances." *Id.* at 548, 391 S.E.2d at 174.

At trial, Defendant sought admission of an after-the-fact direct encounter between himself and Drye. Defendant was not permitted to testify on the issue but made an offer of proof. Defendant's proffer tended to show sometime after the shooting incident Defendant and Drye met and shook hands. Both men apologized

for their actions. They expressed love for one another, and both admitted the incident was "stupid." Drye then embraced Defendant and they hugged.

Defendant argued the encounter was relevant: "Both parties got out of control . . . It goes to self-defense." Defense counsel continued, "the emotional response after . . . can corroborate the events that took place prior."

The State responded the evidence only showed the parties had "kissed and made up." The State continued, arguing the prejudicial effect of admission outweighed any probative value. The State failed to explain what, if any, prejudicial effect the admission of the evidence would have caused.

The trial court sustained the objection and noted its trouble "connecting the dots" and found no probative value. The trial court also noted the evidence would prejudicially affect Defendant but did not state what prejudice would occur.

Applying the plain language of the rule, the proffered testimony fits the definition of relevant evidence: "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. 8C-1, Rule 401. Even if this testimony carried potential emotional appeal, it also carried the tendency to show Defendant's version of the events was credible.

Under the "complete story" or "chain of circumstances" rule, Defendant may be entitled to present a fuller scope of the interactions between the parties concerning

the incident. *See Agee*, 326 N.C. at 547, 391 S.E.2d at 174. While the facts in *Agee* involved before-the-fact interaction, the rule is not limited to either before-the-fact or after-the-fact encounters.

If the jury believed Drye and Defendant later admitted to acting "stupid" during the incident and reconciled, that evidence "forms part of the history of the event," and "serves to enhance the natural development of the facts." *Id.* Under our Courts' interpretation of Rule 404(b) as a "rule of inclusion," the evidence should have been admitted based upon its probative value and lack of prejudice. *Coffey*, 326 N.C. at 278, 389 S.E.2d at 54.

## V. Conclusion

The trial court failed to allow relevant and probative evidence to be admitted for the jury's consideration and resolution. In light of this Court's unanimous holdings on Defendant's right to instructions on self-defense and the aggressor doctrine, upon remand the trial court should address and rule on: (1) whether Defendant may cross-examine Drye regarding the underlying facts of his assault with a deadly weapon with intent to inflict serious bodily injury; (2) whether Defendant may question whether Drye illegally possessed a firearm; (3) whether any conversations, deferrals, and agreements for Drye's testimony by the State: and, (4) whether Defendant should be permitted to testify about the after-the-fact encounter, wherein both parties apologized and recognized the acts were "stupid."

*TYSON, J., concurring*

I fully concur with the majority's opinion on the issues it reaches and resolves. Defendant's remaining issues should be addressed and resolved as they are likely to re-occur at Defendant's new trial.